2020 IL App (1st) 172574-U

No. 1-17-2574

Order filed May 22, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 21431 |
| | ) | |
| LUIS HERRERA, | ) | Honorable |
| | ) | Diane Gordon Cannon, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for aggravated criminal sexual assault and aggravated domestic battery. The circuit court did not abuse its discretion in ruling that the victim's prior statement to police was inadmissible hearsay rather than impeachment of her trial testimony. Defendant's 67-year aggregate sentence was not excessive in light of his extensive criminal background and the nature of the crime.

¶ 2    Following a jury trial, defendant Luis Herrera was found guilty of three counts of aggravated criminal sexual assault and one count of aggravated domestic battery. He was

sentenced to a total aggregate term of 67 years' imprisonment: three consecutive 20-year terms for the three counts of aggravated criminal sexual assault, and a consecutive seven-year term for the aggravated domestic battery. On appeal, defendant contends that his convictions should be reversed and the case remanded for a new trial because the trial court deprived him of his constitutional right to due process by denying his request to call a detective to testify about a prior statement by the victim. Alternatively, defendant argues that his sentence was excessive. For the following reasons, we affirm.

¶ 3     Defendant was charged with a 35-count indictment premised on his actions against J.C. on September 27, 2014.[1]  The State proceeded to trial on three counts of aggravated criminal sexual assault (counts 11, 12, 13) based on three acts of sexual penetration wherein defendant threatened J.C. with a knife (720 ILCS 5/11-1.30(a)(2) (West 2014)); three counts of aggravated criminal sexual assault (counts 17, 18, 19), based on three acts of sexual penetration wherein defendant inflicted bodily harm (720 ILCS 5/11-1.30(a)(2) (West 2014)); and one count (count 32) of aggravated domestic battery (720 ILCS 5/12-3.3(a)) (West 2014)).

¶ 4     At trial, J.C. testified that she and defendant were in a dating relationship for eight years, and have three children together. J.C. ended their romantic relationship in January 2012, but she remained in contact with defendant.

¶ 5     On the evening of September 26, 2014, J.C. attended a party for a friend's birthday, where she drank alcohol and used cocaine. During the party, defendant contacted J.C. through calls and

_____

[1] The indictment included 10 counts of aggravated kidnapping (counts 1 through 10); 21 counts of aggravated criminal sexual assault (counts 11 through 31); two counts of aggravated domestic battery (counts 32 and 33); aggravated battery (count 34); and one count of aggravated unlawful restraint (count 35).

text messages. J.C. agreed to meet with defendant after the party, in the early morning hours of September 27, 2014.

¶ 6    J.C. returned to her apartment after the party. Sometime later, defendant called her and asked her to come outside, telling her that they would "continue partying." J.C. left her apartment and got into defendant's vehicle. Defendant began driving, although J.C. did not know where he was going.

¶ 7    Defendant drove to an apartment complex that J.C. did not recognize. Defendant opened the door to an apartment and they went inside. J.C. asked defendant what was going on and "where's everybody[?]" He told her that no one was there and that he had "made sure of it."

¶ 8    Defendant then punched J.C. in the face above her nose with a closed fist. She began crying and "begged him not to do this." Defendant responded "bitch, you're going to get blood on the carpet" and directed her to a bathroom. In the bathroom, she again pleaded with him to stop but he punched her again, hitting her "right in [her] eye." She "fell on all fours" and was "bleeding everywhere." She begged him to stop, and he proceeded to kick and punch her in the head, back, and stomach.

¶ 9    When J.C. stood up, defendant told her to stop crying or he would hit her again. Defendant directed her to take off her clothes.  She begged him to let her go. He told her "if you just do what I say you will get out of here alive." They went to the living room. As he was standing behind her, she turned toward him and saw that he was holding a "small kitchen knife." He again told her that "if you do what [I] say, you'll live."

¶ 10    Defendant told J.C. to bend over a couch. After she did so, he had anal sex with her. Afterward, defendant walked back and forth, called her a "bitch and a whore" and told her he

would kill her and himself. He still had the knife with him. Some time later, he told her to lay on her back, and he again had anal sex with her. At one point he told her that he should "cut [her] p*** up, because [she] let another man sleep with [her]."

¶ 11 Afterward, defendant directed J.C. to sit on the couch. He squatted in front of her while holding a larger knife, which she described as a "butcher knife." Defendant told J.C. that he had to kill her and then himself because of what he had done. At one point, he directed J.C. to stab him and threatened to kill her if she did not do so. J.C. begged for her life and asked defendant to let her see her children again. Defendant directed her to lay on her stomach, and he proceeded to have anal sex with her a third time.

¶ 12 Afterward, defendant asked J.C. to tell him the location of her boyfriend, and told her to "call him so that [defendant] could kill him." J.C. told defendant that she would take him to where her boyfriend lived, as she believed that was the only way that defendant would let her leave the apartment.

¶ 13 Defendant and J.C. returned to his car, and defendant began to drive. J.C. begged for her life and promised that she would not reveal what defendant had done to her. Eventually, defendant let her out of the car, and she returned to her apartment. J.C. contacted her mother, who drove her to a hospital. J.C. suffered a fractured nose, a black eye, bumps and bruises. J.C. identified People's exhibits 1 through 5 as photographs showing the injuries to her face and exhibit 6 as a photograph showing her body and bloodied clothes. J.C. acknowledged that she initially told hospital personnel and police that defendant had kidnapped her. She testified that she did so because she was embarrassed that she had agreed to meet with him and felt that it was "my fault."

¶ 14    On cross-examination, J.C. admitted that when she first spoke with detectives, she told them that she had been grabbed from behind and dragged into a vehicle before she realized that it was defendant. She later admitted to police that she went into defendant's vehicle voluntarily.

¶ 15    Also on cross-examination, J.C. was asked: "Did you tell the police that night that you and [defendant] had been getting together to have sex?" J.C. answered: "No, I don't remember telling them that."

¶ 16    William Stec, an evidence technician with the Chicago Police Department, testified that he took photographs of J.C. on September 27, 2014. He recalled that J.C. had "bruises on her face and blood splatter all over her." He identified People's exhibits 1 through 6 as photographs he took of J.C.

¶ 17    Natalia Adamska testified that, as of September 2014, she was a nurse in the emergency room of Mount Sinai Hospital and was trained as a Sexual Assault Nurse Examiner. On September 27, 2014, she met with J.C. to collect a sexual assault evidence kit. Adamska observed bruising on the left side of J.C.'s face, around the left eye, her left cheek, and the bridge of her nose. She also observed multiple hematomas on both sides and the back of J.C.'s head. Adamska collected swabs from J.C.'s mouth, anus, and the exterior of her vagina. J.C. declined to have an internal swab of her vagina, and told Adamska that she had not been vaginally penetrated during the assault. Adamska noticed multiple mucosal tears around the anus as well as superficial abrasions and "medium bleeding." Adamska identified People's exhibit 7 as the sexual assault evidence kit.

¶ 18    Elizabeth Zawacki, a forensic scientist for the Illinois State Police, testified that she had tested the sexual assault evidence kit, which indicated the presence of semen on the swabs from J.C.'s anus and the exterior of her vagina.

¶ 19    The parties stipulated that a buccal swab was collected from defendant. The parties also stipulated that, if called, Lisa Kell, a forensic scientist with the Illinois State Police, would testify that she performed DNA analysis on swabs taken from J.C. The anal swabs contained male DNA, but a DNA profile could not be obtained from those swabs. A male DNA profile was identified from the vaginal swabs; defendant could not be excluded from having contributed to that DNA. Kell would testify that approximately 1 in 1.1 septillion black, 1 in 10 sextillion white, or 1 in 270 quintillion Hispanic individuals could not be excluded from having contributed to that DNA profile.

¶ 20    Following the stipulations, the State informed the court that it was not planning to call any other witnesses. Defense counsel moved for a directed verdict, which was denied.

¶ 21    Outside the presence of the jury, the following exchange occurred between the court and defense counsel:

"THE COURT: Are you prepared to proceed?

[DEFENSE COUNSEL]: Yes, your Honor.

THE COURT: Okay. Do you have witnesses here?

[DEFENSE COUNSEL]: Yes. I have Detective McNally in the hallway and my client will be testifying.

THE COURT: Detective McNally as to what? Not impeaching. She didn't say or denied [sic] anything or say that she didn't say anything. A few not recalls, but is there something new you're going into so as not to embarrass yourself with objections sustained?

[DEFENSE COUNSEL]: Your Honor, I believe if we were not to call it would constitute a denial under the law and that I have a right to go into with Mr. McNally what he said or Detective McNally, what she said to him. There were a couple of specific points that she - -

THE COURT: What questions are you going to ask that she was asked, specifically?

[DEFENSE COUNSEL]: I'm going to ask if she had told Detective McNally that she and [defendant] had met for sex several times in the past.

THE COURT: Okay. You never asked her that so that's hearsay. Anything else?

[DEFENSE COUNSEL]: And whether she admitted to Detective McNally to using cocaine the night before and drinking alcohol the night before.

THE COURT: Okay. She testified that she had and that is not impeachment. So you have the defendant to testify?

[DEFENSE COUNSEL]: Yes, your Honor."

¶ 22    Subsequently, in the presence of the jury, People's Exhibits 1 through 8 were admitted, and the State rested. Defendant did not thereafter call Detective McNally to the stand.

¶ 23    Defendant elected to testify. At the outset of his testimony, he acknowledged that in 2014 he pled guilty to the offense of obstructing identification.

¶ 24    Defendant testified that J.C. is the mother of his three children. The weekend before September 27, 2014, he and J.C. went out for drinks and then had sex at her apartment. On the evening of September 26, 2014, defendant was drinking with friends at another apartment.

¶ 25    On the morning of September 27, 2014, he drove to J.C.'s apartment, picked her up, and drove them back to his apartment. He testified that she laid down and said "hurry up baby. Let's do it. The babysitter wants to leave. I can't stay here long." They had sexual intercourse, both vaginally and anally, and then fell asleep. When they woke up around 10 a.m., J.C. was "pretty upset" and told him that the babysitter "was going to get upset that she didn't show up on time."

¶ 26    Defendant testified that J.C. "wanted to argue" but he did not want to argue and said that he would drive her home. After they entered his vehicle, she continued to argue with him. At that time, she told defendant that she had been "seeing somebody else" and referred to that person as her boyfriend. Defendant had not known about the boyfriend, and so he was hurt and upset. Defendant "got angry," they continued to argue, and he "ended up hitting her." He stated that he struck J.C. with a closed fist three times.

¶ 27    Defendant denied that J.C. ever told him that she did not want to have intercourse, or that she ever told him to stop. He denied that he ever threatened her with a knife, and he denied that he hit her at any point before their argument in his vehicle.

¶ 28    On cross-examination, defendant denied that he and J.C. had broken up before September 27, 2014. He denied knowing that she had a boyfriend until they were arguing in his vehicle. He stated that he struck her because his "emotions got the best of [him]." On redirect examination, defendant testified that at one time he had lived with J.C., but they were not living together as of September 2014. The defense rested following defendant's testimony.

¶ 29    The jury found defendant guilty of three counts of aggravated criminal sexual assault (corresponding to three separate acts of penetration) and one count of aggravated domestic battery.

The jury found him not guilty of three counts of aggravated criminal sexual assault with a dangerous weapon.

¶ 30    Defendant filed a posttrial "Motion to Set Aside Verdict of Guilty or For a New Trial." In that motion, defendant claimed that the trial court "erred in effectively prohibiting Defense was [sic] calling Detective McNally as a witness in Defense's case in chief." During argument on that motion, the trial court asked defense counsel: "At what point did I prohibit you from calling a witness?" Defense counsel answered:

> "Your Honor, during break I informed the Court that I wished to call Detective McNally, and you said that the two areas of questioning that I wanted to go into, you would not allow me to go into, and effectively thereby prohibited me from calling him."

The court responded:

> "I never said that. That was never put on the record. And, again, you can argue anything, but these things should be supported by the record. * * * When the Appellate Court sees that the Judge wouldn't allow the defense to call a witness, their radar goes up, correctly I would say. When that didn't happen, we can't just put that in the motion so it does go up. So we can't state things that didn't happen to get a new trial."

The court thus denied the motion.

¶ 31    Before sentencing, the court received a presentence investigative report (PSI) for defendant. The PSI reflected that defendant's criminal history consisted of a number of prior

offenses, including a 1997 guilty plea for possession of a stolen motor vehicle for which he was sentenced to 18 months probation; a 1998 domestic battery conviction for which he was sentenced to 12 months probation; a 2010 conviction for unlawful use of a weapon for which he was sentenced to 14 days in jail; and a 2014 guilty plea to the offense of obstructing identification, for which he was sentenced to 30 days in jail. The PSI also indicated that defendant had close relationships with his mother and siblings, that he had been employed prior to his incarceration, and that he was pursuing his GED certificate.

¶ 32    At defendant's sentencing hearing, the State presented evidence of two pending cases against him. Detective Jose Castenda testified that, in 2014, defendant had been charged with criminal exploitation of a child, in connection with a May 2010 incident involving D.L., J.C.'s daughter. A recording of D.L.'s victim-sensitive interview was played before the court. Detective Lisa David testified that, in November 2014, defendant was charged with attempt predatory criminal sexual assault. That case arose from a 2008 incident involving another victim, J.N. The court viewed J.N.'s victim-sensitive interview at the sentencing hearing.[2]

¶ 33    Arguing in aggravation, the State referred to J.C.'s testimony that she was repeatedly sexually assaulted, the victim-sensitive interviews of D.L. and J.N., and defendant's criminal history. The State argued that "based on all of that and based on the heinous nature of the crime that was committed against [J.C.] we would be asking for a substantial sentence."

¶ 34    In mitigation, defense counsel argued that the PSI showed that defendant had "made effective use of his time since arrest" and had gone through a "religious awakening." Counsel

_____

[2] Although the transcript of the sentencing hearing reflects that the video recordings of the victim-sensitive interviews with D.L. and J.N. were admitted into evidence and played before the court, those recordings are not contained in the record on appeal.

pointed out that defendant had begun taking Bible study classes and was working to obtain his GED. Counsel further argued that the PSI reflected that defendant's prior criminal history was "relatively limited" and non-violent. Counsel thus urged that defendant had "great potential for rehabilitation" and requested a sentence "closer to the minimum."

¶ 35    In announcing defendant's sentence, the court stated that it had considered "not only the facts of this crime but [defendant's] criminal history, as well as [defendant's] social history." The court noted defendant's multiple prior offenses and remarked that he did not learn from his past convictions. The court also commented that "[t]his was a vicious unwarranted attack on a woman who was the mother of [defendant's] children." The trial court sentenced defendant to a 20-year sentence on each of the three counts of aggravated criminal sexual assault with bodily harm (counts 17, 18, and 19), to be served consecutively. The court also sentenced him to a seven-year sentence for aggravated domestic battery (count 32), also to be served consecutively, for an aggregate sentence of 67 years' imprisonment.

¶ 36    Defendant immediately moved to reconsider sentence. In denying that motion, the court stated that although the case was "horrific," it believed that defendant was "entitled to some light at the end of the tunnel, which is why [the court] did not give [him] the maximum sentence." Defendant appeals.

¶ 37    On appeal, defendant first challenges the trial court's ruling that he could not call McNally to ask him whether J.C. told him that she and defendant "had met for sex several times in the past." On that basis, he seeks reversal and a new trial.

¶ 38    In setting forth this argument, defendant frames the propriety of the court's ruling as a constitutional issue. He asserts that the trial court denied him his "constitutional right to call

witnesses and present a defense" by precluding him from calling McNally. He argues that his due process rights include the right "to call any witness he desires." He contends that the court's ruling deprived him of his right to impeach J.C.'s credibility, thus violating his right to cross-examine the State's witnesses, pursuant to the sixth amendment of the United States Constitution. Defendant maintains that the question of whether his constitutional rights were violated by the trial court's ruling is subject to *de novo* review.

¶ 39    In response, the State frames the trial court's ruling as an evidentiary issue. The State contends that the court properly exercised its discretion when it ruled that the testimony defendant sought to elicit from McNally–that J.C. told McNally that she had been meeting with defendant for sex–was inadmissible hearsay, rather than admissible impeachment. As such, the State maintains that the deferential abuse of discretion standard applies. We agree with the State.

¶ 40    The record shows that the trial court made an evidentiary ruling that defense counsel could not call McNally to elicit testimony about J.C.'s prior statement, finding that the prior statement would constitute inadmissible hearsay. Such evidentiary rulings are reviewed for an abuse of discretion. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 45 ("The admission of evidence is within the sound discretion of the trial court, whose ruling will not be disturbed absent an abuse of that discretion."). With this standard in mind, we examine the propriety of the trial court's ruling.

¶ 41    "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein and dependent for its value on the credibility of the out-of-court declarant." *Johnson*, 2013 IL App (1st) 111317, ¶ 45. "Hearsay is generally inadmissible unless it falls within an exception to the hearsay rule [Citation.] There is an exception to the hearsay rule for prior inconsistent statements of a testifying witness, which may be admitted to impeach the witness's credibility.

[Citation.]" *Id*. ¶ 46. In this case, defendant contends that the prior statement made by J.C. to McNally would have impeached J.C.s' trial testimony, and thus did not run afoul of the hearsay rule. For the following reasons, we disagree.

¶ 42    Section 115-10.1 of the Code of Criminal Procedure of 1963 codifies a hearsay exception in criminal cases for prior inconsistent statements, if certain conditions are met. 725 ILCS 5/115-10.1 (West 2018). This court has explained:

> "Under section 115-10.1, a prior inconsistent statement may be offered not just for purposes of impeachment, but as substantive evidence, so long as the witness is subject to cross-examination and the statement:
>
> '(1) was made under oath at a trial, hearing, or other proceeding, or
>
> (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
>
> (A) the statement is proved to have been written or signed by the witness, or
>
> (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission of the prior statement is being sought, or at a trial, hearing, or other proceeding, or
>
> (C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.' 725 ILCS 5/115-10.1(c) (West 2008))." *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38.

Even if a prior inconsistent statement does not meet the statutory requirements to be admitted as substantive evidence under section 115-10.1, it may still be admitted to impeach a witness's credibility. See 725 ILCS 5/15-10.1 (West 2018) ("Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein."); *People v. Edwards,* 309 Ill. App. 3d 447, 453 (1999) ("A prior inconsistent statement may be used for impeachment even if it does not meet the standard set forth in section 115-10.1 of the Code.").

¶ 43    In this case, defendant does not suggest that J.C.'s prior statement to McNally should have been admitted as substantive evidence, *i.e.*, to prove that J.C. had prior sexual encounters with defendant. Rather, he argues that the prior statement would have impeached J.C.'s trial testimony, casting doubt on her credibility. However, even to be admitted for the sole purpose of impeachment, the prior statement must have actually been *inconsistent* with J.C.'s trial testimony.

¶ 44    Defendant relies on J.C.'s trial testimony that she did not remember telling police that she and defendant had been meeting for sex prior to September 27, 2014. Defendant asserts that he was entitled to impeach that testimony by calling McNally, who would testify that J.C. had told McNally that she and defendant had previously met for sex. Defendant claims that the trial court did not allow that question "because [it] believed, incorrectly, that defense counsel had not asked J.C. this question during cross-examination." Thus, he disputes the trial court's conclusion that such testimony from McNally would have been improper hearsay, rather than permissible impeachment of J.C.

¶ 45    The State maintains that J.C.'s prior statement to McNally was not inconsistent with her trial testimony, and so the trial court correctly determined that it was inadmissible hearsay. The

State suggests that defense counsel, in cross-examining J.C., failed to ask questions in a way that would properly lay a foundation for impeachment. The State emphasizes that J.C. "was only asked if she told police" about prior sexual encounters with defendant (rather than asking whether those encounters actually occurred), and J.C. responded that she did not remember. The State suggests that, because J.C.'s trial testimony did not explicitly deny the prior sexual encounters, her prior statement to McNally would not be inconsistent with her trial testimony, and so would not be proper impeachment. We agree with the State.

¶ 46    We recognize that "inconsistency in the literal sense is not always required for impeachment." *People v. Henry*, 47 Ill. 2d 312, 320 (1970). "A prior statement need not directly contradict a witness' trial testimony to be inconsistent. [Citations.] Inconsistencies may be found in evasive answers or a witness's silence. [Citation.]" *People v. Leonard*, 391 Ill. App. 3d 926, 934 (2009); see also *People v. Martin*, 408 Ill. App. 3d 891, 895 (2011) (explaining that, to be admissible under section 115-10, "[t]he prior statement need not directly contradict testimony given at trial to be considered inconsistent, as that term also includes evasive answers, silence, or changes in position."). We also recognize that a trial court may find inconsistency when a witness at trial claims an inability to remember a prior statement. See *People v. Martin*, 408 Ill. App. 3d 891, 895 (2011) (a witness's prior written statement to police was admissible under section 115-10 where her trial testimony "contradicted her written statement in that she professed her inability to remember it—something that the trial court specifically found to be evasive."); see also *People v. Evans*, 2016 IL App (3d) 140120, ¶ 35 ("Arguably, if the proper foundation had been laid, Lindsey's prior trial testimony made under oath could have been admitted substantively as an

'inconsistent' statement to Lindsey's response that he did not remember if he was with defendant on the day of the murder.").

¶ 47    Nonetheless, our precedent instructs that a deferential standard of review applies to a trial court's determination of whether there is inconsistency between a witness's trial testimony and her prior statement. *Leonard*, 391 Ill. App. 3d at 934 ("This court reviews a trial court's determination as to * * * whether a prior statement is inconsistent for an abuse of discretion. [Citations.]"); see also *People v. Flores*, 128 Ill. 2d 66, 87-88 (1989) ("The determination of whether a witness' prior testimony is inconsistent with his present testimony is left to the sound discretion of the trial court."). In reviewing this determination, we keep in mind that "[a]n abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. [Citation.]" *People v. Gregory*, 2016 IL App 2d 140294, ¶ 24.

¶ 48    In this case, the record reflects that the trial court did not permit defense counsel to elicit J.C.'s prior statement to McNally (that she and defendant had met for sex on prior occasions), because it did not find this to be inconsistent with her trial testimony, which was simply that she did not remember telling this to police. We cannot say that the trial court's ruling was unreasonable. Stated differently, the court did not abuse its discretion in finding that J.C.'s testimony was not inconsistent with her prior statement to McNally. As the State points out, J.C. was not asked directly at trial whether she had been having sex with defendant on prior occasions. Instead, defense counsel asked her: "*Did you tell the police that night* that you and [defendant] had been getting together for sex?" (Emphasis added.) She responded: "No, I don't remember telling them that." Defendant suggests that the trial court was obligated to construe this question and

answer as J.C.'s denial of past sexual encounters with defendant, such that her prior statement to McNally would constitute impeachment. However, we cannot say that this was the only permissible, reasonable interpretation of J.C.'s trial testimony. That is, J.C.'s response to defense counsel's question could reasonably be interpreted to mean merely that J.C. did not recall whether she had shared this information with police, rather than an explicit denial that the prior sexual encounters had actually occurred. In turn, the trial court could reasonably conclude that, even if McNally were to testify that J.C. told him that she had past sexual encounters with defendant, that prior statement would not be inconsistent with her trial testimony, which was that she simply did not remember discussing this with police. Thus, the trial court's finding that J.C.'s prior statement to McNally would be inadmissible hearsay, rather than permissible impeachment of her trial testimony, was not an abuse of discretion. Accordingly, we cannot say that the court erred in ruling, as an evidentiary matter, that defense counsel could not question McNally about that prior statement.

¶ 49    We note that, in light of this conclusion, defendant's reliance on the confrontation clause is unavailing. "The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *People v. Tracewski*, 399 Ill. App. 3d 1160, 1165-66 (2010). "Generally, a witness is considered subject to cross-examination when he is placed on the stand under oath and willingly answers questions and the opposing party has an opportunity to cross-examine him. [Citation.]" *Leonard*, 391 Ill. App. 3d at 934. The record reveals that defense counsel had a fair opportunity to cross-examine J.C. Defense counsel could have directly asked J.C. whether she had prior sexual encounters with defendant; instead, counsel merely asked her whether she had told

this to police. As defendant had ample opportunity to cross-examine J.C., and as we have determined that the trial court did not err in ruling that the prior statement to McNally was inadmissible hearsay, there is no confrontation clause violation. In sum, we reject defendant's claim of error based upon the court's ruling regarding the admissibility of J.C.'s prior statement to McNally.

¶ 50 Defendant next contends that his 67-year sentence was excessive. In setting forth this argument, he emphasizes that, since he was 37 years old at the time of sentencing, he will most likely spend the rest of his life in prison. He claims that this "does not comport with the goal of the Illinois constitution of restoring [him] to useful citizenship." He also argues that the sentence is at odds with the trial court's statement that he should have a "light at the end of the tunnel." Defendant suggests that, in imposing sentence, the trial court gave undue weight to his criminal history, as his prior offenses were "relatively minor." He contends that he should have an opportunity to eventually reintegrate into society, noting that his PSI reflected that he had close family relationships, that he was employed prior to incarceration, and that he was pursuing a GED. He thus requests that we reduce his sentence, or that we remand for resentencing.

¶ 51 Under the Illinois Constitution, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference. [Citations.] A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Alexander*, 239 Ill. 2d

205, 212-13 (2010). "The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 52    "A reviewing court may only reduce a sentence under Illinois Supreme Court Rule 615 when the record shows that the trial court abused its discretion. [Citation.]" *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Id*.

¶ 53    Given the record in this case, we cannot conclude that defendant's sentence was an abuse of discretion. First, as defendant acknowledges, the aggregate 67-year sentence was within statutory limits. Each of the three aggravated criminal assault offenses is a Class X offense, subjecting him to a sentence of 6 to 30 years for each count. 720 ILCS 5/11-1.30(d)(1) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). The sentencing range for the offense of aggravated domestic battery, a class 2 offense, is three to seven years. 720 ILCS 5/12-3.3(b) (West 2016); 730 ILCS 5/5-4.5-35 (West 2016). Pursuant to the Unified Code of Corrections, the trial court was required to impose consecutive sentences, because defendant was convicted of aggravated sexual assault. 730 ILCS 5/5-8-4(d)(2) (West 2018). Thus, the applicable aggregate sentencing range was between 21 and 97 years. Defendant's aggregate sentence of 67 years was well within this applicable sentencing range. In turn, we cannot conclude that it is excessive unless it is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the

offense." *Busse*, 2016 IL App (1st) 142941, ¶ 20. On the record before us, we cannot reach that conclusion.

¶ 54    In arguing that the court unduly emphasized his prior criminal history and failed to account for mitigating aspects of his PSI, defendant essentially invites us to reweigh the various factors presented to the trial court. This we cannot do, even if we would have weighed them differently than the trial court. *Alexander*, 239 Ill. 2d at 214-15; *Stacey*, 193 Ill. 2d at 209. In any case, we note that defendant's PSI indicated a lengthy criminal history, beginning when he was 17 years old, which the trial court was certainly entitled to take into account. In announcing sentence, the court stated that it had considered "not only the facts of this crime but [defendant's] criminal history, as well as [defendant's] social history." The court noted defendant's multiple prior arrests and remarked that he did not learn from his past convictions. See *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 13 (defendant's " 'criminal history alone' " may warrant a sentence " 'substantially above the minimum' " (quoting *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009)).

¶ 55    Furthermore, the State introduced evidence of two pending cases against defendant, including the recordings of two victim-sensitive interviews. Significantly, although the record reflects that the victim-sensitive interviews were admitted into evidence and reviewed by the trial court prior to sentencing, defendant failed to include them in his record on appeal. "The appellant has the burden of providing a sufficiently complete record on appeal so that the reviewing court is fully informed regarding the issues to be resolved; in the absence of a complete record on appeal, it is presumed that the trial court's judgment conforms to the law and has a sufficient factual basis. [Citation.]" *People v. Moore*, 377 Ill. App. 3d 294, 300 (2007); see also *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 157 (2005) ("Without an adequate record preserving the claimed

error, the reviewing court must presume the circuit court had a sufficient factual basis for its holding and that its order conforms with the law. [Citations.]") We lack the ability to review the victim-sensitive interviews due to defendant's failure to include them in the record. Thus, we presume that their contents further supported the trial court's sentencing decision. See *Corral*, 217 Ill. 2d at 157 ("Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." (quoting *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984))).

¶ 56 Moreover, nothing in the record rebuts the presumption that the court properly considered the mitigating factors presented and defendant's rehabilitative potential. *People v. Brazziel,* 406 Ill. App. 3d 412, 434 (2010) ("it is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it; and the burden is on the defendant to affirmatively show the contrary."). Indeed, the court's expressed desire to offer defendant a "light at the end of the tunnel" by imposing 30 years less than the 97-year maximum aggregate sentence indicates that the court did exercise some manner of discretion.

¶ 57 Most importantly, there is no question that the underlying offenses were extremely violent and serious, justifying a severe sentence regardless of any mitigating factors. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 ("Because the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence. [Citations.]"). Here, the record shows that the court expressly noted that "[t]his was a vicious unwarranted attack on a woman who was the mother of [defendant's] children." In denying defendant's motion to reconsider sentence, the court again noted that this was a "horrific" offense. In sum, we cannot conclude that the trial court abused

its discretion in sentencing defendant. We thus reject defendant's request for reduction of his sentence or resentencing.

¶ 58    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59    Affirmed.