# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Johnson*, 2013 IL App (1st) 111317

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN JOHNSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1317 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed<br>Rehearing denied | June 28, 2013<br><br>July 19, 2013<br>July 26, 2013<br>August 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder was upheld over his contentions that errors occurred in the State's re-cross-examination of a defense witness, the denial of defense counsel's request for re-redirect examination of a defense witness, the admission of evidence that was hearsay, the State's use of a document purporting to be notes taken during an interview of a witness, and the trial court's attempt to define "reasonable doubt" during *voir dire* and to question potential jurors about whether they had any "qualms" about the principles set forth in Supreme Court Rule 431(b). |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-10177 (01); the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Kathleen Hill, all of State
Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon
Walters, and Nancy Colletti, Assistant State's Attorneys, of counsel), for
the People.

Panel

JUSTICE HALL delivered the judgment of the court, with opinion.
Justices Gordon and Reyes concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Norman Johnson was convicted of first-degree murder in the shooting death of Jerrell Jackson. The trial court denied defendant's motion for a new trial and he was sentenced to 40 years' imprisonment. The trial court subsequently denied defendant's motion to reconsider his sentence. He now appeals his conviction. For the reasons that follow, we affirm.

¶ 2    The events in this case stemmed from an underlying ongoing dispute between a man named Douglas Johnson, also known as "Fresh" or "Doug," and a man named Jason Coley. Evidence was presented that approximately a week prior to the shooting, Johnson and Coley were involved in an ongoing dispute over a stolen firearm belonging to Coley.

¶ 3    The evidence established that in the late evening of September 21, 2008, Johnson was riding a bike in the 700 block of South St. Louis Avenue in Chicago, Illinois. Jerrell Jackson and several other men were playing dice on the sidewalk. Jackson's girlfriend, Margaret Faulkner, who was 16 years old at the time, was watching the dice game from a first-floor window of a three-story apartment building located almost directly across the street from the dice game. Faulkner and Johnson gave trial testimony concerning events immediately preceding the shooting.[1]

¶ 4    Faulkner testified that after the dice game ended, everyone who participated in the game left the area except for Jackson. Faulkner noticed Johnson ride past on a bike. Faulkner then observed two men wearing hooded sweatshirts (hoodies) emerge from the alley near her window. The men looked toward Johnson and began shooting. Faulkner testified that Johnson was shot and fell, but he got up and ran from the scene. Faulkner momentarily left the window and ran to wake her cousin. When they returned to the window, Faulkner saw

---

[1]At the time of trial, Faulkner was in custody on a contempt charge for failing to comply with a State subpoena to testify in this case and Johnson was in custody on a pending charge of unlawful use of a weapon by a felon.

Jackson lying on the ground. The shooters were gone.

¶ 5    Faulkner and her cousin ran outside to check on Jackson. He died at the scene from gunshot wounds to his abdomen and upper body. Johnson sustained a nonfatal gunshot wound to his left arm requiring surgery. A third man, sitting in a first-floor apartment, sustained a nonfatal gunshot wound from a stray bullet.

¶ 6    Johnson's version of events differed somewhat from Faulkner's version. Unlike Faulkner, Johnson testified that the dice game was still in progress when the shooting began. He also testified that there were three shooters, rather than two shooters.

¶ 7    Johnson, a convicted felon, testified that just prior to the shooting, he was riding a bike along the sidewalk on the 700 block of South St. Louis Avenue, when he encountered a dice game being played on the sidewalk. Johnson testified that he did not want to disrupt the dice game by riding through it, so he stopped on his bike to allow Jerrell Jackson to roll the dice. As Jackson was shaking the dice preparing to roll, Johnson looked around to make sure no police were in the area. He then observed three men standing across the street at the mouth of the alley. The men were standing in a triangle formation.

¶ 8    One man wore a white T-shirt and a baseball cap pulled down on his head. The other two men wore black hoodies with the hoods pulled over their heads. Johnson called Jackson's attention to the men, asking if he recognized any of them. As Jackson turned to look, the man wearing the white T-shirt said "yeah, nigger," and started shooting. Johnson recognized the voice as belonging to Coley.

¶ 9    Johnson jumped off his bike and started running. Jackson and another young man who had been playing dice also ran. Jackson fell to the ground. Johnson was shot and momentarily fell to the ground before getting up and running from the scene. Johnson was taken to the hospital, where he received treatment for a gunshot wound to his arm.

¶ 10    Johnson denied speaking with detectives at the hospital, even though it was stipulated that if Detective Maresso were called to testify, she would testify that she and her partner interviewed Johnson in the emergency room at Mount Sinai Hospital on September 22, 2008, and that during the interview, Johnson stated that he recognized Coley as one of the shooters. Johnson told detectives that he and Coley grew up in the same neighborhood and had known each other for a number of years.

¶ 11    On September 23, 2008, two days after the shooting, detectives interviewed Faulkner at her mother's house. Faulkner signed a photo spread advisory form which stated that photos of the individuals involved in the shooting were not necessarily included in the photo array. Faulkner then viewed three negative photo arrays. A negative photo array is an array of photos that does not include a photo of the suspect. Faulkner did not make any identifications from this group of photos.

¶ 12    Detective Roberto Garcia testified that on September 23, 2008, he and his partner met with Johnson in an alley near the scene of the shooting. They interviewed Johnson and showed him two photo arrays. Johnson did not make any identifications from this group of photos. Johnson denied speaking with the detectives on September 23, 2008, but acknowledged his signature on a photo spread advisory form for that date.

¶ 13    Police continued their investigation, speaking with potential witnesses and gathering

more information. The detectives eventually created two additional photo arrays. One array included a photograph of defendant and the other a photograph of Coley. Detective Garcia interviewed Johnson on October 5, 2008, at police headquarters. Johnson viewed the photo arrays and identified Coley as one of the shooters and identified defendant as being with Coley when the shooting began. At trial, Johnson testified that when he identified defendant and Coley he was merely identifying who they were and not that they had done anything.

¶ 14    In December 2008, police arrested Coley in connection with the shooting. He subsequently gave a statement confessing to the shooting and identified defendant as a shooter. On December 16, 2008, Johnson and Faulkner viewed separate physical lineups and identified Coley as one of the shooters. Faulkner testified that approximately two weeks after she identified Coley, detectives informed her that he had confessed to the shooting. Faulkner also gave a statement to the assistant State's Attorney, stating that during the shooting, Coley was wearing red and black, and that the second shooter was wearing all black.

¶ 15    On January 13, 2009, Johnson appeared before a grand jury and identified Coley as one of the shooters. In May 2009, detectives received an anonymous telephone tip informing them of defendant's location. Defendant was arrested on May 16, 2009. That same day, Faulkner viewed a physical lineup and identified defendant as the second shooter. She testified the police did not suggest whom she should identify.

¶ 16    On May 26, 2009, Faulkner testified before a grand jury and identified a photograph of Coley as the first shooter and identified a photograph of defendant as the second shooter. At trial, Faulkner testified that defendant was the second shooter and that if there was a third shooter, she would not have been able to observe him from her vantage point at the window.

¶ 17    Johnson acknowledged he appeared before a grand jury on May 28, 2009, and identified defendant and Coley as persons he saw raise their respective guns and fire. Contrary to his grand jury testimony, Johnson testified at trial that he did not actually observe defendant shoot his firearm because after Coley started shooting, he closed his eyes and ran. Johnson added that he did not see any of the shooters' faces and only identified Coley based on his voice. Johnson acknowledged telling the assistant State's Attorney that he would refuse to testify at trial and would claim he was being forced to testify.

¶ 18    At the time of trial, Coley was serving a 24-year prison sentence after pleading guilty to the murder of Jerrell Jackson. Coley testified that Johnson was the intended target of the shooting, not Jackson. Coley testified that approximately a week prior to the shooting, he and Johnson were engaged in an ongoing dispute over a stolen firearm and that Johnson had made verbal threats against him.

¶ 19    Coley testified that just prior to the shooting, he met with defendant and a man he did not know. Coley, defendant, and the unnamed man then went looking for Johnson on the 700 block of South St. Louis Avenue, an area Johnson was known to frequent. Coley was wearing a white T-shirt and brown hat. When the trio emerged from an alley onto St. Louis Avenue, Coley looked across the street and observed Johnson and a crowd of men playing dice. Coley testified that as he and Johnson looked at each other, he thought he saw Johnson reaching into his waistband for a gun. Coley began shooting at Johnson.

¶ 20    Coley testified that defendant and the unnamed man were behind him when he began

shooting. He testified that Jerrell Jackson was hit when Johnson, who was the intended target, stepped back. Coley claimed he could not remember if defendant or the other man had guns in their hands when the shooting started. However, in a prior statement to detectives and the assistant State's Attorney, Coley stated that he and defendant were both armed with 9-millimeter handguns. Coley further stated that he shot five or six times and was not paying attention to how many times defendant shot his firearm.

¶ 21 Evidence technicians and lab analysts testified that shell casings recovered from the crime scene were fired from two different guns. No fingerprint evidence was recovered from any of the shell casings.

¶ 22 Defendant presented an alibi defense, seeking to establish that he was at his girlfriend's house at the time of the shooting. English Wilson, who was defendant's girlfriend at the time, testified she was discharged from the hospital on the afternoon of September 21, 2008, after undergoing surgery for an ectopic pregnancy. Wilson claimed she then traveled to her apartment, which was located miles from the scene of the shooting. Wilson testified defendant stayed with her all afternoon, evening, and overnight while she recuperated from the surgery.

¶ 23 On cross-examination, Wilson acknowledged that even after she discovered defendant had been arrested for murder, she still never contacted the police to provide them with any alibi information. Wilson and her cousin, Deontae Saunders, gave conflicting testimony regarding who helped Wilson up to her second-floor apartment after she returned home from the hospital. Wilson testified that when she arrived home, defendant and her sister helped her up the stairs to her apartment. In contrast, Saunders testified that he, defendant, and Wilson's brother carried Wilson up the stairs to her apartment.

¶ 24 After being admonished by the trial court, defendant chose not to testify. Following closing arguments, the jury returned a verdict of guilty of first-degree murder. Defendant's posttrial motion for a new trial was denied. He was sentenced to 40 years' imprisonment. The trial court denied defendant's motion to reconsider his sentence. This appeal followed.

¶ 25                                    ANALYSIS

¶ 26 Defendant first raises a number of arguments relating to the State's re-cross-examination of defense witness Kimyona Taylor, an investigator with the public defender's office. None of the arguments warrant reversal.

¶ 27 Taylor was called as a defense witness to impeach Margaret Faulkner's credibility concerning her identification of defendant as one of the shooters. On direct examination, Taylor testified that on January 7, 2011, approximately a week before trial began, she spoke to Faulkner concerning the shooting. Taylor claimed she took written notes of the conversation, read them back to Faulkner and allowed her to read and review the notes. When Faulkner verified the notes reflected what she had said, she signed the notes. Taylor's testimony contradicted Faulkner's claim that she never reviewed the notes before signing them. Taylor's notes were introduced as an exhibit.

¶ 28 On cross-examination, Taylor was asked whether her conversation with Faulkner on January 7, 2011, was the first time she had spoken to Faulkner. Taylor answered, "[n]o, it's

not the first time," and then admitted that on December 14, 2009, she accompanied defense counsel to interview Faulkner. Taylor maintained she did not take any notes of the interview conducted in December 2009.

¶ 29    Taylor testified that during the January 7 interview, Faulkner told her Coley was one of the shooters and that there was a second or "other" shooter, described as short and dark. Taylor testified she wrote down "other shooter" in her notes only because Faulkner claimed the police told her there were two shooters and showed her a photograph of a man whose name she did not recognize. Taylor acknowledged she never showed Faulkner a photograph of defendant during the interviews conducted in December 2009 or January 2011.

¶ 30    On redirect examination, defense counsel elicited testimony from Taylor to the effect that Faulkner was a teenager, susceptible to suggestion. Taylor testified that when she interviewed Faulkner on January 7, 2011, she made an effort not to suggest to Faulkner what answers to give because Faulkner had already claimed the police suggested to her whom to pick out as the shooter. Taylor's testimony contradicted Faulkner's testimony that the police never suggested to her whom she should identify.

¶ 31    Defense counsel then elicited the following testimony from Taylor regarding her interview with Coley conducted on January 6, 2011:

"Q. And did anything happen with respect to this case the day before you went to see Margaret Faulkner, January 7, 2011?

A. Yes.

Q. What was that?

A. I sat in on an interview of another individual on this case.

Q. And that would have been on January 6th of this year [2011]?

A. Correct.

Q. And who was that individual?

A. Jason Coley.

Q. And was it after that that you went back to Margaret Faulkner and asked her about the events, wrote your notes down and asked her to sign them?

A. Yes."

¶ 32    After these questions and answers, the State elicited the following on re-cross-examination:

"Q. Ms. Taylor, since you mentioned an interview that you had the day before with Jason Coley, I would like to ask you some questions about that now.

A. Okay.

Q. Did this interview take place here in the back of the courtroom?

A. Yes.

Q. And who was present for that interview?

A. Myself, attorney Ruth McBeth, attorney Kelly McCarthy, Jason Coley and an individual from the Illinois Department of Corrections.

Q. And of course you were taking notes during this interview of Jason Coley; is that correct?

A. No, I was not.

Q. Is this the first time that you had an opportunity to interview Jason Coley?

A. Yes, it was.

Q. And so obviously you also wanted to familiarize yourself with the case and the facts of the case, correct?

A. Yes."

¶ 33    The State showed Taylor a document purporting to be notes taken during Coley's interview. Taylor acknowledged she did not personally author the document, but added it accurately reflected her recollection of what Coley said during the interview. The State then noted that the document showed Coley stated four people, rather than three, participated in the shooting. Taylor acknowledged this, and when asked to elaborate, testified that Coley stated one person remained in the car, while the other three exited the vehicle to look for Johnson.

¶ 34    The State pointed out to Taylor that Coley's statement about three people shooting was not reflected in the document. Defense counsel objected on the ground that Taylor had not identified the document. The trial court overruled the objection finding that defense counsel had introduced the subject of Coley's interview.

¶ 35    Taylor testified that during his interview, Coley stated he knew three of the people, one being defendant, but that defendant never fired his gun. Defense counsel withdrew her objection. Later, over another defense objection, the State elicited testimony from Taylor that during the interview, Coley mentioned defendant's name, but added defendant never fired his gun.

¶ 36    Defendant now argues on appeal that the State's re-cross-examination of Taylor went beyond the scope of defense counsel's redirect examination. Defendant claims that when the State probed into the substance of Coley's statements during its re-cross-examination of Taylor, the questioning exceeded the scope of defense counsel's redirect examination. We disagree.

¶ 37    Trial court rulings regarding the scope of cross-examination and re-cross-examination are within the sound discretion of the trial court. *People v. Blackwell*, 76 Ill. App. 3d 371, 378 (1979); *People v. Graves*, 2012 IL App (4th) 110536, ¶ 16. Such rulings will not be disturbed absent an abuse of discretion resulting in manifest prejudice to the defendant. *Blackwell*, 76 Ill. App. 3d at 378. We find no abuse of discretion here.

¶ 38    Generally, cross-examination is limited in scope to the subject matter inquired into on direct examination. *People v. Williams*, 66 Ill. 2d 478, 486 (1977). However, this limitation is construed liberally to allow inquiry into whatever subject tends to explain, qualify, discredit or destroy the witness's direct testimony although it may incidentally constitute new matter which aids the cross-examiner's case. *Id*. at 486; *People v. Terrell*, 185 Ill. 2d 467, 498 (1998).

¶ 39    As mentioned, Taylor testified on redirect examination that on January 6, 2011, she sat

in on an interview with Coley, and the next day she met with Faulkner to obtain her signature on notes from an earlier interview. Taylor's testimony could have left the jury with the impression that it was something Coley said during his interview that prompted Taylor to go back and obtain Faulkner's signature on notes from the earlier interview. On re-cross-examination, the State was entitled to rebut the possible impression left by defense counsel's redirect examination of Taylor.

¶ 40    Defendant next contends the trial court abused its discretion by denying defense counsel an opportunity to conduct re-redirect examination of Taylor regarding the newly expanded scope of questioning. Again, we must disagree.

¶ 41    We first observe this issue has not been properly preserved for review. Generally, to preserve the issue of the wrongful exclusion of evidence, an offer of proof must be submitted. *People v. Cobb*, 186 Ill. App. 3d 898, 905 (1989). The purpose of an offer of proof is to inform the trial court and opposing counsel of the nature and substance of the evidence to be introduced and to preserve the evidence for review. *People v. Ferns*, 247 Ill. App. 3d 278, 286-87 (1993).

¶ 42    In this case, defense counsel did not make an offer of proof at trial. When the State concluded its re-cross-examination of Taylor, defense counsel merely requested to conduct re-redirect examination of Taylor, which the trial court denied. Thus, defendant has forfeited this issue by failing to make an offer of proof. Moreover, defendant has not shown how he was prejudiced by being prohibited from conducting re-redirect examination of Taylor.

¶ 43    The purpose of redirect examination is to explain new matters brought out on cross-examination. *People v. Tingle*, 279 Ill. App. 3d 706, 716 (1996). On redirect examination a witness may be asked questions designed to remove unfavorable inferences or impressions raised on cross-examination. *People v. Sanchez*, 73 Ill. App. 3d 607, 610 (1979). In this case, Taylor testified on re-cross-examination that Coley told her the defendant never fired his weapon. There has been no showing of a need to further develop this testimony on re-redirect examination.

¶ 44    Defendant next argues that the substance of the statements Coley made in the January 6 interview were inadmissible hearsay not subject to any exception to the hearsay rule. The State counters that Coley's statements were not offered as substantive evidence but were, rather, offered for impeachment purposes as prior inconsistent statements that contradicted his trial testimony.

¶ 45    The admission of evidence is within the sound discretion of the trial court, whose ruling will not be disturbed absent an abuse of that discretion. *People v. Thomas*, 171 Ill. 2d 207, 218 (1996). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein and dependent for its value on the credibility of the out-of-court declarant. *People v. Crowe*, 327 Ill. App. 3d 930, 937 (2002). The fundamental basis for excluding such a statement is the lack of an opportunity to test the credibility of the statement through cross-examination. *Id.*

¶ 46    Hearsay is generally inadmissible unless it falls within an exception to the hearsay rule. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). There is an exception to the hearsay rule for prior inconsistent statements of a testifying witness, which may be admitted to impeach the

witness's credibility. *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38.

¶ 47     The State may attack the credibility of a witness by impeaching the witness with a prior inconsistent statement. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 57. However, when the State impeaches its own witness with a prior inconsistent statement, the State must show that the witness's trial testimony affirmatively damaged its case. *Id.* In order for witness testimony to be affirmatively damaging, as opposed to merely disappointing to the prosecution's case, the testimony must give "positive aid" to the defendant's case. *People v. Cruz*, 162 Ill. 2d 314, 360 (1994); *People v. McCarter*, 385 Ill. App. 3d 919, 933 (2008).

¶ 48     Here, the State contends Coley's trial testimony affirmatively damaged its case where he testified that he lied about "a lot of stuff in the interrogation." The State also points to Coley's testimony where he testified he implicated defendant after detectives showed him defendant's photograph and provided him with defendant's name. The State further points to Coley's testimony where he testified that when he was interviewed by detectives, he knew defendant had been arrested and then released, and he became suspicious that defendant had implicated him in the crime. The State argues that the clear import of Coley's testimony was to suggest he implicated defendant only after he came to believe defendant had implicated him and because detectives had provided him with defendant's name and photograph.

¶ 49     We do not believe the State's case was affirmatively damaged by such testimony. Coley's statements were not impeaching because they were not inconsistent with his trial testimony. The State contends Coley's statements were impeaching because he mentioned defendant's name during the interview. However, Coley never wavered in his trial testimony that defendant was a shooter.

¶ 50     Nonetheless, even if the trial court erred in admitting this evidence, it was harmless error in light of the fact that similar evidence was heard by the jury when defense counsel cross-examined Coley. See *People v. Chatmon*, 236 Ill. App. 3d 913, 930-31 (1992) (improper impeachment subject to harmless error analysis). On cross-examination, Coley testified that a couple of weeks prior to trial, he had a conversation with defense counsel during which he stated four people instead of three participated in the crime, and that the third and fourth men were his friends.

¶ 51     Defendant next contends the State was improperly allowed to re-cross-examine Taylor with the document purporting to be notes taken during Coley's interview. Defendant argues that no adequate foundation was laid for the document where Taylor testified she had not authored the document. We disagree. A proper foundation was laid when Taylor testified that although she did not personally author the document, it accurately reflected her recollection of what Coley said during the interview. See *People v. Lewis*, 52 Ill. App. 3d 477, 483 (1977).

¶ 52     Defendant next contends the trial court committed reversible error when it attempted to define "reasonable doubt" for the jury during *voir dire*. During *voir dire* the trial court made the following comments:

        "The State has the burden of proof beyond a reasonable doubt. In Illinois we do not–it is not defined by the Supreme Court or by the State legislature. That's something for you to decide. But if any of you have served on a civil jury, if you use the analogy of a scale,

all you have to do is tilt it. And that's proof beyond a preponderance of the evidence.

In a criminal case, if you use the same scale, it's a balance like this. (Indicating.) Proof beyond a reasonable doubt is the highest burden that there is at law in Illinois and the United States."

¶ 53 The trial court's comments show the court indicated to the jury that proof beyond a reasonable doubt is a higher standard than the civil standard of proof by a preponderance of the evidence. While referring to a scale, the trial court evidently gestured to show an imaginary tipping of the balance to demonstrate the difference between the two standards.

¶ 54 Although we do not condone the reference and comparison to the civil standard, we cannot say that the trial court's comments constitute error, particularly where the court told jurors that reasonable doubt was the highest burden at law and that it was for them to decide what reasonable doubt meant. Therefore, even if we reviewed this issue under the plain-error doctrine, we would find there was no error.

¶ 55 Finally, we reject defendant's contention that he was denied a fair trial on the ground that the trial court failed to question prospective jurors in accordance with the amended version of Supreme Court Rule 431(b).[2] Effective May 1, 2007, Supreme Court Rule 431(b) was amended to impose a *sua sponte* duty on trial courts to question prospective jurors, individually or in a group, as to whether they understood and accepted the principles outlined in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), "that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." See *People v. Haynes*, 399 Ill. App. 3d 903, 912 (2010).

¶ 56 Defendant claims the trial court failed to comply with Rule 431(b), when after explaining each principle, the court merely asked jurors if any of them had any "qualms" about these principles. Defendant maintains that while asking about "qualms" may be sufficient to determine whether jurors accepted the principles enumerated in Rule 431(b), it does not offer any insight into whether they actually understood them. Defendant acknowledges he failed to preserve this issue for review, but asks us to consider the matter under the plain-error doctrine on the ground that the evidence was closely balanced in light of his alibi evidence.

¶ 57 The issue of whether a trial court complied with a supreme court rule is reviewed *de*

_____

[2]Supreme Court Rule 431(b), as amended, provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

*novo*. *People v. Lloyd*, 338 Ill. App. 3d 379, 384 (2003). In *People v. Thompson*, 238 Ill. 2d 598, 607 (2010), our supreme court held that in order to comply with Rule 431(b), the trial court "must ask each potential juror whether he or she understands and accepts each of the principles in the rule." The court stated that Rule 431(b) "requires questioning on whether the potential jurors both understand and accept each of the enumerated principles." *Id.*

¶ 58     We acknowledge some courts have concluded that a trial court's failure to specifically question potential jurors during *voir dire* as to whether they understood and accepted the principles enumerated in Rule 431(b) does not necessarily constitute error. See, *e.g.*, *People v. Digby*, 405 Ill. App. 3d 544, 548-49 (2010) (trial court's use of the phrase "have a problem with" did not constitute error); *People v. Ingram*, 401 Ill. App. 3d 382, 393 (2010) (trial court's inquiry as to whether potential jurors had any "difficulty or quarrel" with any of the *Zehr* principles did not constitute error); *People v. Quinonez*, 2011 IL App (1st) 092333, ¶¶ 5, 50 (finding no error where trial court asked prospective jurors if they had "a problem" or "disagreed" with any of the *Zehr* principles).

¶ 59     Nevertheless, we find that the supreme court's holding in *Thompson* compels us to conclude otherwise. We believe that if trial courts followed the language of Rule 431(b), and specifically asked prospective jurors during *voir dire* if they understood and accepted the principles enumerated in the rule, this would have the beneficial effect of putting an end to arguments as to whether particular words chosen by a trial judge complied with the rule. That being said, we must decline defendant's request to review this matter under the closely balanced prong of the plain-error analysis. Under the closely balanced evidence prong of plain-error review, a defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 60     In light of the evidence presented at trial, we do not find that the evidence was so closely balanced that the trial court's error in questioning prospective jurors concerning their understanding and acceptance of the principles enumerated in Rule 431(b) constituted plain error. In his recorded statement to detectives, Jason Coley identified defendant as one of the shooters and stated that he and defendant were both armed with 9-millimeter handguns. Evidence technicians and lab analysts testified that the shell casings recovered from the scene came from two different guns.

¶ 61     On the date defendant was arrested, Margaret Faulkner viewed a physical lineup and identified him as one of the shooters. Faulkner testified before a grand jury and identified a photograph of defendant as one of the shooters. Faulkner testified at trial that just before the shooting began, she saw two men wearing hoodies emerge from the alley near her window. The men looked toward Douglas Johnson and started shooting. Faulkner testified defendant was the second shooter, and if there was a third shooter, she would not have seen him from her vantage point at the window.

¶ 62     Douglas Johnson testified that just before the shooting began, he saw three men standing across the street from him, at the mouth of an alley. The men were standing in a triangle formation and two of the men wore hoodies. Johnson recognized Coley as one of the shooters. Johnson later viewed two photo arrays and identified Coley as one of the shooters

and identified defendant as being with Coley when the shooting began. Johnson also appeared before a grand jury and identified defendant as one of the men who raised a handgun and fired.

¶ 63    Although defendant emphasizes that he presented alibi testimony, we note that his alibi witnesses included his girlfriend and her cousin. The trier of fact is not required to accept alibi testimony over positive identification of an accused, particularly where the alibi testimony is provided by biased witnesses. *People v. Mullen*, 313 Ill. App. 3d 718, 729 (2000). Moreover, the alibi testimony was inconsistent and not credible. Defendant's girlfriend, English Wilson, testified that when she arrived home from the hospital, defendant and her sister helped her up the stairs to her second-floor apartment. In contrast, Wilson's cousin, Deontae Saunders, testified he, defendant, and Wilson's brother carried Wilson up the stairs to her apartment. In sum, defendant has failed to show that the trial court's error in questioning prospective jurors as to their understanding and acceptance of the principles enumerated in Rule 431(b) amounted to plain error under the closely balanced prong of the plain-error analysis.

¶ 64    Accordingly, for the reasons set forth above, we affirm the judgment of the circuit court.

¶ 65    Affirmed.