2020 IL App (1st) 181233-U

THIRD DIVISION
December 23, 2020

No. 1-18-1233

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 7086 |
| | ) | |
| MEREDITH SMITH, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Vincent M. Gaughan, |
| | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's claims that the court erred in questioning the jury pursuant to Illinois Supreme Court Rule 431(b), improperly defined the reasonable doubt standard, and failed to include self-defense language in the aggravated battery instruction, did not amount to plain error.

¶ 2    Following a jury trial, defendant, Meredith Smith, was found guilty of aggravated battery to a peace officer and sentenced to nine years' imprisonment. In this direct appeal from that judgment, defendant asks this court to reverse his conviction and remand for a new trial. Defendant contends that the trial court failed to comply with Illinois Supreme Court Rule 431(b) when

questioning prospective jurors, improperly defined the reasonable doubt standard for the jurors, and failed to include self-defense language in the aggravated battery jury instruction. Defendant additionally contends that, even if none of the foregoing errors require reversal individually, this court should still reverse his conviction and remand for a new trial because the cumulative effect of the above errors deprived him of a fair trial.

¶ 3     The record shows that defendant was charged with aggravated battery to a police officer. During jury selection for defendant's trial on that charge, the trial court explained to the prospective jurors,

> "Under the law the defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and it is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that the defendant is guilty. The state has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The defendant is not required to prove his innocence nor is he required to present any evidence on his own behalf. He may rely upon the presumption of innocence."

¶ 4     The court then told the prospective jurors that it wanted to "talk to [them] about some basic principles of constitutional law that apply to all criminal cases." First, the court explained that

> "anybody placed on trial in a criminal case is presumed to be innocent of the charge against him. Basically what does this mean? If you are selected as a jur[or] in th[is] case *** and I told you to go back to the jury room immediately and I want you to come back with a verdict, the only verdict you could come back with is not guilty.

One, there is no evidence against [defendant] and the other important factor is he is presumed to be innocent of the charge against him."

¶ 5    The court asked the potential jurors to raise their hands if there was "anybody who does not accept that constitutional principle." No hands were raised. The court further asked if there was "anybody who has any qualms or problems about applying that constitutional principle." Again, no hands were raised.

¶ 6    The court continued:

"The next constitutional principle I want to talk to you about, some of you may have served on juries in civil cases. There the burden of proof is proof beyond a preponderance of the evidence. If you looked at a scale, all you have to do is tilt it. The definition of preponderance is it's more likely than not that the event occurred. But in a criminal case the burden of proof is proof beyond a reasonable doubt. This is the highest burden of proof at law."

¶ 7    The court asked the jurors to raise their hands if there was anyone who did "not accept the constitutional principle that the burden of proof in a criminal case is proof beyond a reasonable doubt," or if anyone had "any problems or qualms about applying that principle," and no hands were raised.

¶ 8    The court then explained that, along with the burden of proof, the "burden of going forward is on the State. So the constitutional principle there is the State has the burden of proof going forward and this is proof beyond a reasonable doubt." The court asked if anyone did "not accept that constitutional principle," or if anyone had "any problem or qualms about applying *** those constitutional principles," and no hands were raised.

¶ 9    The court continued:

3

"The next constitutional principle I want to talk to you about is anybody placed on trial in a criminal case has a constitutional right to testify on their own behalf. So if [defendant] decides to testify on his own behalf, it's also part of the constitution that you have to judge his credibility like you would any other witness."

¶ 10    No hands were raised when the court asked if there was anyone who did "not accept that constitutional principle" or if anyone had "any problems or qualms about applying that constitutional principle."

¶ 11    Finally, the court told the prospective jurors:

"If you look at this as a constitutional coin and you turn it over, anybody placed on trial in a criminal case has a constitutional right not to testify. And if [defendant] decides not to testify, no inference whatsoever can be drawn from his silence. Does anybody not accept that constitutional principle, please raise your hand. *** Does anyone have any problems or qualms about applying that constitutional principle in the courtroom, please raise your hand."

No hands were raised in response to either inquiry.

¶ 12    Thereafter, the jury was selected and the parties presented oral arguments.

¶ 13    The State called Officer Michael Chlebek, who testified that he is employed as a Chicago police officer and that he was on duty and in uniform on April 25, 2017. Around 5:30 p.m. on that date, Officer Chlebek and his partner, Officer Nicholas Gies, were responding to a call of shots fired at a house in the 3800 block of West Monroe in Chicago.

¶ 14    When Officers Chlebek and Gies arrived, other officers were already at the scene. There were approximately 12 to 15 police vehicles that had responded to the call. Other officers who had already arrived, chased a suspect into the house, and the suspect was apprehended inside. Officer

Chlebek testified that he was not one of the officers who apprehended the suspect. Instead, Officer Chlebek was outside the house, speaking to the homeowner on the stairs of the house. As Officer Chlebek spoke to the homeowner, defendant "came up by the fence" that surrounded the house and started "yelling" and "being disruptive," telling the officers to "get the f*** out." The homeowner told defendant to leave, but defendant did not do so.

¶ 15    The homeowner then asked Officer Chlebek to tell defendant to leave. Officer Chlebek told defendant that he was "interfering with [the] investigation" and that he "need[ed] to leave the area." Defendant still did not leave. Instead, defendant asked Officer Chlebek, "[W]hat are you going to do about it, p***[?]" and "chest bump[ed]" Officer Chlebek on the sidewalk. Officer Chlebek further explained that defendant "walk[ed] up close to [Officer Chlebek's] face, stuck out his chest, [and] str[uck] [Officer Chlebek's] chest." Officer Chlebek used one hand to "push [defendant] out of the way to create distance" and told defendant that if he "c[a]me here again" Officer Chlebek would "lock [him] up." At that point, defendant "c[a]me toward [Officer Chlebek] with a closed fist" and "tried to strike" Officer Chlebek on the head. Officer Chlebek blocked the punch with his hand. Defendant attempted to place Officer Chlebek in a headlock, and Officer Chlebek then performed an emergency takedown, wherein Officer Chlebek "lift[ed] [defendant] up" and both men fell on the sidewalk. Defendant was then placed under arrest.

¶ 16    Officer Chlebek testified that he suffered bruising to his ankle and knee, and a torn rotator cuff. Officer Chlebek was not able to return to duty for 83 days after the incident as a result of his injuries. Officer Chlebek identified photographs showing scuff marks on Chlebek's pants, bruising to his knee and ankle, and an abrasion on his shoulder, which were admitted into evidence. Officer Chlebek testified that defendant did not have any visible injuries, and reiterated that, prior to defendant chest bumping him, Officer Chlebek had not touched defendant.

5

¶ 17    On cross-examination, Officer Chlebek admitted that he did not include in his report that he warned defendant that he would arrest him if he "c[a]me at" Officer Chlebek again.

¶ 18    Officer Nicholas Gies testified that he is a Chicago police officer. Officer Gies confirmed that he was on duty and in uniform on April 25, 2017, at about 5:30 p.m., along with his partner, Officer Chlebek. Officer Gies testified that, after the suspect was arrested in the basement of the house, he and Officer Chlebek were speaking to the homeowner on the front porch of the house. Defendant, who was on the sidewalk in front of the house, was "being a little belligerent and interfering with [the] investigation" by "yelling" and "distract[ing]" the homeowner while the officers were talking to her. Defendant swore at the officers, and told them to "get the f*** out of here you p***." The homeowner asked the officers if they could "get him out of here." Officers Gies and Chlebek stepped off the porch and "told [defendant] to leave." Defendant responded, "You are not going to do s***." Defendant then "chest bumped" Officer Chlebek, coming up to Officer Chlebek and touching him "chest to chest in a pushing manner." Officer Chlebek "used one hand to push [defendant] away." Defendant then swung at Officer Chlebek's face with a closed fist, and Officer Chlebek blocked the punch by raising his arm. Defendant then "attempted to *** put [Officer Chlebek] in a choke hold," and Officer Chlebek performed an "emergency takedown." Officer Gies testified that defendant never asked him for medical treatment, while Officer Chlebek did seek medical treatment for his injuries.

¶ 19    On cross-examination, Officer Gies admitted that at a preliminary hearing, he had previously testified that defendant had "tried" to chest bump Officer Chlebek, agreeing with defense counsel's characterization that the testimony indicated that defendant did not succeed in doing so. On redirect, however, Officer Gies testified that he had been asked a follow-up question

6

at the preliminary hearing, and had answered affirmatively when asked whether defendant did chest bump Officer Chlebek.

¶ 20    Chicago police officer Jose Gallegos testified that he also responded to the shots fired call and was in uniform, standing outside of the building as Officers Chlebek and Gies spoke to someone who claimed to live in the building. At that point, defendant "approached *** and began to shout at" the officers. Officer Gallegos could not "remember verbatim" what defendant said, but testified that it was "something along the lines of 'he didn't do nothing, leave him alone,' along with a lot of profanity." Officer Chlebek was standing a few feet from defendant. Defendant approached Officer Chlebek, and Officer Chlebek told him to "back off because he was getting close." Defendant told Officer Chlebek "something along the lines of 'you're not going to do s***, you can't do s*** to me." Defendant then "got even closer and chest bumped Officer Chlebek and followed by attempting to strike him with his fist." Officer Gallegos testified that "a fight ensued" and both defendant and Officer Chlebek ended up on the ground. Officer Chlebek then "regained control" and placed defendant in custody. Officer Gallegos testified that he saw no injuries on defendant and that Officer Chlebek did not touch defendant in any way before defendant chest bumped him. Following Officer Gallegos's testimony, the State rested.

¶ 21    Defendant took the stand on his own behalf. Defendant admitted that he had prior convictions for selling drugs and for felony possession of a weapon.

¶ 22    Defendant testified that on April 25, 2017, around 5:30 p.m., he was walking toward the house when he saw police officers, and someone who defendant identified as "the victim," run across the street. Defendant saw a lot of police officers run to the "back of the yard," and some entered the home in the front, while others entered in the back. Defendant said that it "took a while" and "then the victim *** came out handcuffed and they *** walked past me after they *** walked

the gangway from the back to the front." Defendant stated that he was "standing a little far from the gangway at the neighbor's house *** holding [his] hand on the gate." Defendant saw officers speaking with a woman in front of the house.

¶ 23   Defendant reiterated that they had "the victim *** handcuffed" and "they w[ere] walking him to the police car." Then, "for no reason like 5 minutes after they arrested him in the police car [Officer Chlebek] had come to push me and said 'get the f*** on.' " Defendant claimed that Officer Chlebek pushed defendant's chest with two hands, and that defendant had not spoken to Officer Chlebek before Officer Chlebek pushed him. Defendant testified that he then told Officer Chlebek, "touch me again," and Officer Chlebek pushed defendant's chest again using two hands. After Officer Chlebek pushed defendant a second time, defendant "leaned back," "swung" at Officer Chlebek with a closed fist, "and missed." Defendant stated that he "felt harassed." At that point, defendant "got snapped" and "attacked" by "all the POs" from behind defendant and to his right side. The officers "bum rushed" defendant and placed him in custody. When asked whether Officer Chlebek "ever pick[ed] [defendant] up and f[e]ll to the ground with [him,]" defendant responded, "I don't know at all, no, no, no." Defendant denied kicking the officer in the knee or striking him in the shoulder. Defendant further stated that he was not injured, and that he did not get any medical treatment.

¶ 24   On cross-examination, defendant testified that he had been "around the neighborhood drinking since 8:30 that morning." Defendant also testified that the person who the officers were chasing was defendant's cousin. Defendant stated that he stayed at the scene because he "wanted to make sure" that the police did not "get a case on" or "harass" his cousin "because they are known for doing that so [defendant] wanted to be his witness just in case he needed one."

¶ 25    On redirect, defendant testified that he had been "drinking some Henny" and "was tipsy" but was not "intoxicated."

¶ 26    The defense rested, and the parties presented closing arguments. Following deliberation, the jury found defendant guilty of aggravated battery to a peace officer. Thereafter, the court conducted a sentencing hearing, and sentenced defendant to nine years' imprisonment. Defendant's motion to reconsider that sentence was denied, and defendant filed a timely notice of appeal from the judgment.

¶ 27    Defendant asks this court to reverse his conviction and remand for a new trial. Defendant contends that the trial court failed to comply with Illinois Supreme Court Rule 431(b) when questioning the prospective jurors, improperly defined the reasonable doubt standard to the jurors, and failed to include self-defense language in the aggravated battery jury instruction. Defendant additionally contends that the cumulative effect of the above errors deprived him of a fair trial. We will address each of defendant's arguments in turn.

¶ 28    First, defendant contends that this court should reverse his conviction and remand for a new trial because the trial court failed to comply with Illinois Supreme Court Rule 431(b) in several respects when questioning prospective jurors.

¶ 29    Rule 431(b) requires the trial court to "ask each potential juror, individually or in a group, whether that juror understands and accepts" four principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that, before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that, if a defendant does not testify, it cannot be held against him or her. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see also *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984).

¶ 30    Defendant contends that the trial court failed to question the prospective jurors about the third principle, that defendant was not required to offer any evidence on his own behalf. Additionally, defendant contends that the court asked the prospective jurors whether they accepted the remaining principles, but did not question them as to whether they "understood" the principles, instead asking the jurors only whether they had any "qualms" or "problems" with applying them. Defendant apparently concedes that he forfeited these errors. He argues that this court should review the court's noncompliance as plain error, and that reversal is warranted because the case was "closely balanced." See *People v. Jackson*, 2020 IL 124112, ¶ 81 (plain error provides "a narrow and limited exception to the general rule of procedural default."). We review the trial court's compliance with Rule 431(b) *de novo. People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 31    Rule 431(b) allows the court to question prospective jurors either individually or in a group, provided the court affords "an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Failing to ask even one juror whether he or she understands and accepts even one of the four principles is clear error. *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 26.

¶ 32    Here, the trial court did not ask the prospective jurors whether they understood the principles, instead asking whether they had any "qualms" or "problems" with applying them. The State agrees that the court failed to use the "exact language of the rule," but argues the court's questioning as to whether any juror had "problems" or "qualms" regarding those principles "ensured that the jurors understood the principles at issue: because a juror's inability to understand a principle constitutes a 'problem,' a juror's response to the effect that he has 'no problems' with a principle implies that he understands it."

¶ 33    Our supreme court has previously rejected this argument, holding that asking potential jurors whether they have a "problem with" or "disagree with" the principles, rather than whether they understand and accept them, is clear error. *People v. Sebby*, 2017 IL 119445, ¶ 49; *People v. Wilmington*, 2013 IL 112938, ¶ 32. Accordingly, the trial court's questioning regarding whether the potential jurors had "problems" or "qualms" with applying the principles was not sufficient to comply with Rule 431(b) (*Sebby*, 2017 IL 119445, ¶ 49), and the trial court committed clear error (*People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 26). A trial court is required to strictly comply with the rule, and the court did not do so here.

¶ 34    Additionally, the trial court failed to question the prospective jurors about the third principle required by Rule 431(b), that defendant was not required to offer any evidence on his own behalf. The State apparently concedes this error, and we agree. *Thompson*. 238 Ill. 2d at 602-03; 607 (where the trial court failed to ask any of the prospective jurors if they understood and accepted the third principle, the failure, "by itself, constitutes noncompliance with the rule"); see also *Wilmington*, 2013 IL 112938, ¶¶ 28-32 (where the trial court "did not even inquire regarding the jury's understanding and acceptance of the principle that defendant's failure to testify could not be held against him, *** error clearly occurred.").

¶ 35    Having concluded that the trial court committed a clear or obvious error, our next inquiry is whether the error amounted to plain error.

¶ 36    In Illinois, there are two categories or "prongs" of plain error, which allow a court to "exercise discretion and excuse a defendant's procedural default." *Sebby*, 2017 IL 119445, ¶ 48. The first is when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, and the second is when a clear or obvious error occurred and that error is so serious

that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* "In both instances, the burden of persuasion remains with the defendant." *Herron*, 215 Ill. 2d at 187.

¶ 37     In this case, defendant argues that the court's errors in questioning the venire amounted to first-prong plain error, because the evidence was closely balanced. Defendant does not argue that the court's errors amounted to second-prong plain error. See *id.*, ¶ 52 ("A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury.").

¶ 38     The State, however, argues that defendant cannot show first-prong plain error because he argued only the closeness of the evidence and "fail[ed] to argue prejudice," pointing out that "the word 'prejudice' does not appear anywhere in the relevant section of defendant's brief." The State further contends that the court's failure to question the jurors about the third principle was "indisputably harmless" because defendant did offer evidence by testifying at trial.

¶ 39     Although the State attempts to distinguish between prejudice and closely balanced evidence, our supreme court has explained that it is the closely balanced nature of the evidence that makes an error prejudicial under first-prong plain error. *Sebby*, 2017 IL 119445, ¶ 68 ("What makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive."). "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. As our supreme court has explained, "[t]he only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced." *Id.*, ¶ 69.

¶ 40 A case is closely balanced when "it can hardly be said that reasonable jurors could only draw from [the evidence] a conclusion of guilt." *People v. Nelson*, 193 Ill. 2d 216, 223 (2000). To determine whether a case was closely balanced, we undertake "a qualitative, commonsense assessment" of the evidence as a whole, including any evidence that bears on the credibility of the witnesses. *Sebby*, 2017 IL 119445, ¶ 53. Defendant bears the burden of persuasion (*People v. Fort*, 2017 IL 118966, ¶ 18 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005))), but he does not need to show how the error may have contributed to the verdict; his burden is simply to show that the evidence was closely balanced (*Sebby*, 2017 IL 119445, ¶ 51).

¶ 41 In this case, defendant argues that the evidence was "a close credibility contest," and that the competing versions of events were "largely consistent, but diverged around the element in dispute: who the initial aggressor was." Defendant contends that both versions were plausible, and that neither side "presented unassailable accounts." Defendant points to the facts that his cousin had been arrested and that he had been drinking, as well as Officer Chlebek's failure to include his warning to defendant in his report, and Officer Gallegos's "changing" preliminary hearing testimony.

¶ 42 We find the alleged inconsistencies in the officers' testimony to be relatively minor, particularly when compared to the significant impeachment of defendant's testimony. Against the generally consistent and corroborated accounts testified to by the three police officers, defendant presented an account in which he admitted to having been drinking for approximately nine hours prior to the incident. Moreover, defendant's own account provided a motive for defendant's battery to Officer Chlebek, as defendant explained that the officers were pursuing defendant's cousin, and defendant "wanted to make sure" that the police did not "get a case on [his cousin]" or "harrass him." Defendant's testimony was also impeached with his prior felony convictions. *Sebby*, 2017

13

IL 119445, ¶ 53 (in determining whether a case is closely balanced, the reviewing court assesses the evidence, including "any evidence that bears on the credibility of the witnesses."); *People v. Catchings*, 2018 IL App (3d) 160186, ¶ 34 (evidence of a defendant's prior conviction was "relevant to and probative of defendant's credibility").

¶ 43    Additionally, although defendant contends that no extrinsic evidence corroborated or contradicted the competing accounts, we disagree. Officer Chlebek testified, without contradiction, that he sustained injuries that required him to be off duty for 83 days, and the State presented photographs of those injuries. Officer Chlebek's injuries, documented in the photographs, were consistent with the version of events testified to by the officers, which culminated in a scuffle on the ground between Officer Chlebek and defendant. Defendant, on the other hand, testified that Officer Chlebek pushed him, that defendant attempted to punch Officer Chlebek but missed, and that the other officers from behind and to the side of defendant, "attack[ed]" him and put him in custody. However, under defendant's version of events there is no explanation for how Officer Chlebek would have sustained the uncontroverted injuries documented in the photographs. In these circumstances, we do not find the evidence to be closely balanced, and accordingly, find no plain error to excuse defendant's procedural default.

¶ 44    Defendant next argues that the trial court improperly defined the reasonable doubt standard to the jurors. The specific comments to which defendant takes issue are the following:

> "The next constitutional principle I want to talk to you about, some of you may have served on juries in civil cases. There the burden of proof is proof beyond a preponderance of the evidence. If you looked at a scale, all you have to do is tilt it. The definition of preponderance is it's more likely than not that the event occurred.

But in a criminal case the burden of proof is proof beyond a reasonable doubt. This

is the highest burden of proof at law."

¶ 45    Defendant argues that the trial court erred by "attempting to define reasonable doubt for the jury" and "by invoking the tilting scale analogy and discussing the preponderance of the evidence standard of proof in civil cases." Defendant further contends that the court improperly "framed the burden of proof as a question of the quantity of evidence against [defendant], rather than its overall quality," and "implied that [defendant] could be convicted with only slightly more *** or better *** evidence than would be required in a typical civil case." Defendant concedes that this claim is forfeited, but requests that this court review it for plain error.

¶ 46    Illinois is among the jurisdictions that do not define reasonable doubt, and our supreme court has consistently held that neither the court nor counsel should define reasonable doubt for the jury. *People v. King*, 2020 IL 123926, ¶ 48. The rationale behind this rule is that "reasonable doubt" is self-defining and needs no further definition. *People v. Downs*, 2015 IL 117934, ¶ 19. However, not all references to the reasonable doubt standard are improper. It is only when the "jury [i]s being given a definition for the term 'reasonable doubt,' " or when the court or counsel "attempts to define or dilute the 'reasonable doubt' standard," that "problem[s]" arise. See *King*, 2020 IL 123926, ¶ 49-50.

¶ 47    We disagree with defendant's characterization of the court's comments in this case. The trial court did not define the reasonable doubt standard for the jury, and instead was using the scale analogy in explaining the preponderance of the evidence standard, noting how that standard of proof differs from reasonable doubt. See *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 67, 70-71 (finding no error in the court's use of a "scale analogy to define preponderance of the evidence to explain how that standard of proof differs from reasonable doubt, which the trial court

15

emphasized is the highest burden of proof at law."). All the court said about the reasonable doubt standard was that it is the applicable burden of proof "[i]n a criminal case" and that it is "the highest burden of proof at law." This was not error. *King*, 2020 IL 123926, ¶ 49-50; *People v. Johnson*, 2013 IL App (1st) 111317; *Green*, 2017 IL App (1st) 152513.

¶ 48    This Court has held nearly identical comments were not erroneous in *Johnson*, 2013 IL App (1st) 111317 and *Green*, 2017 IL App (1st) 152513. In *Johnson*, the trial court used the scale analogy to demonstrate the higher standard of proof beyond a reasonable doubt compared to the civil standard of proof by a preponderance of the evidence. *Johnson*, 2013 IL App (1st) 111317, ¶ 52. Although this court did not "condone the reference and comparison to the civil standard," we concluded that the trial court's comments did not constitute error when the trial court also told the potential jurors that reasonable doubt was the highest burden at law and that it was for the jury to decide what reasonable doubt means. *Id.* ¶ 54. In the case at bar, as in *Johnson*, the trial court did not refer to any numerical value when discussing reasonable doubt, and did not define reasonable doubt, only informing the venire that it is a higher burden than the preponderance standard. See *id.* ¶ 52.

¶ 49    Similarly, in *Green*, 2017 IL App (1st) 152513, the trial court used a scale analogy to demonstrate that the civil burden of proof was different than the burden of proof in a criminal case and stated that " 'proof beyond a reasonable doubt is the highest burden of proof at law.' " *Id.* ¶¶ 10, 62. On appeal, we determined that the court's statement "clearly and accurately stated the law" when it (1) identified the applicable burden of proof as beyond a reasonable doubt, (2) distinguished the lesser standard of proof in civil cases, and (3) emphasized that reasonable doubt is the highest standard of proof at law. *Id.* ¶ 62. We therefore concluded that the trial court did not err during preliminary instructions. *Id.*

¶ 50    We decline defendant's invitation to depart from our previous decisions. As in *Johnson* and *Green*, we find no clear or obvious error, and defendant's procedural default must be honored.

¶ 51    Defendant next contends that he is entitled to a new trial because "the definition instruction for aggravated battery did not include the requisite self-defense language." Defendant concedes that this issue, too, is forfeited, and asks this court to review it for plain error. The State agrees that the court erroneously omitted the language from its definition instruction, but contends that the error is not reversible as plain error. Because we have already concluded that the evidence was not closely balanced for first-prong plain error review, we will consider whether this claim is reviewable as second-prong plain error.

¶ 52    On this issue, we find this court's decision in *People v. Rios*, 318 Ill. App. 3d 354 (2000), instructive. In *Rios*, the defendant challenged the trial court's "failure to include 'without lawful justification' language in [a] murder definition instruction." *Id*. at 360. Similarly here, the defendant had waived the issue by failing to raise it at trial, and instead argued that the failure amounted to plain error under both prongs. *Id*. This court outlined the evidence in that case, concluding that it was not closely balanced, and thus, the error was not reversible as first-prong plain error. *Id*. at 361.

¶ 53    Turning to the applicability of second-prong plain error, this court went through the instructions given by the trial court, which included a definitional instruction for first degree murder which did not include the phrase "without legal justification," as well as an issues instruction which did include the appropriate self defense language. *Id*. at 359-60. This court noted that the jury was also given a self-defense instruction. *Id*. at 360. This court further described the closing arguments, in which both parties discussed the "without legal justification" issue, noting that the jury had to decide whether the defendant's use of force was justified. Based on the above,

17

this court concluded that "the jury was adequately instructed," given the "extensive discussion of the justification issue during both parties' closing arguments and the use of the appropriate language in the issues and self-defense instructions." *Id.* at 364. "After reviewing the 'totality of the circumstances,' " this court rejected the defendant's second-prong plain error argument, finding that the "defendant was not deprived of a fair trial by the trial court's failure to include 'without lawful justification' language in the murder definition instruction." *Id.*

¶ 54    As in *Rios*, the required self-defense language ("without legal justification") was omitted from the definition instruction for the relevant offense in this case. However, also similar to *Rios*, the jury in this case received both a general instruction on self-defense ("A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the eminent use of unlawful force") and an issues instruction that included the appropriate self-defense language ("To sustain the charge of aggravated battery, the State must prove ***[t]hat the defendant was not justified in using the force which he used"). The jury is presumed to have followed the issues instruction. See *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 86 ("[W]e must presume that the jurors read both the definitional and issues instructions *** [a]nd when they did so, they would understand that the State could not prove that defendant committed [the offense] unless they also concluded that defendant did not act in self-defense.").

¶ 55    Additionally, the issue of justification was referred to repeatedly during both parties' closing arguments in this case, as it was *Rios*. The State explained to the jury that "[t]he law says *** [that] [t]o sustain the charge of aggravated battery, the State must prove *** that the defendant was not justified in using the force which he used." The State continued:

> "Let's talk about the justified use of force. A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is

necessary to defend himself against the imminent use of unlawful force. There is no self-defense here. There is no justified use of force.

[Defendant is] the antagonist. He chest bumps the officer. He punches at the officer. This defendant takes the stand and tells you he is acting in self-defense.

When [defendant] takes that witness stand, you evaluate his credibility just like you evaluate the credibility of every other witness, and as a two-time convicted felon, you can use that information in evaluating his credibility. He's the only one with a motive to lie to you because he doesn't want to be held responsible for what he did.

There is no self-defense here. If anyone availed himself of self-defense, it was the officer after being taunted and attacked by this defendant, and the officer used reasonable force to detain this defendant and the law recognizes that sometimes force is required during the course of police investigations."

¶ 56    Defense counsel also addressed justification, positing that "[s]elf-defense *** is what this case is truly about." Counsel argued that defendant was "absolutely justified" in "tak[ing] that swing at" Officer Chlebek, because Officer Chlebek was "being a bully," "coming up to [defendant and] pushing him." Counsel further stated that defendant swung at Officer Chlebek "because he was scared [and] did not feel safe." These closing arguments, combined with "the issues instruction [that] properly advised the jury as to the elements *** and did not contradict any of the other instructions," served to adequately inform the jury of the law governing defendant's claim of self-defense. *Rios*, 318 Ill. App. 3d at 362. Accordingly, defendant is not entitled to relief under second-prong plain error because the error did not deny him a fair trial. *Id.* at 361, 364.

¶ 57    Finally, defendant argues that, even if none of the foregoing errors require reversal individually, this court should still reverse his conviction and remand for a new trial because the cumulative effect of the above errors deprived him of a fair trial. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *Green*, 2017 IL App (1st) 152513, ¶ 117. " '[T]he cumulative errors that warrant such an extreme result must themselves be extreme.' [Citation.]" *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55. There can be no cumulative error where no error occurred at all and generally, no cumulative error will be found where alleged errors do not amount to reversible error on any individual issue or where such errors did not rise to the level of plain error. *Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 58    Although we have found that the trial court did not strictly comply with Rule 431(b) in questioning the jury, and that the court erroneously omitted "without legal justification" from the definition instruction, we have also found that those errors did not amount to plain error or deny defendant a fair trial. We therefore find no "pervasive pattern of unfair prejudice" and reject defendant's claim that the cumulative effect of those errors denied him a fair trial. *Green*, 2017 IL App (1st) 152513, ¶ 117.

¶ 59    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 60    Affirmed.