2021 IL App (2d) 190512-U
No. 2-19-0512
Order filed June 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-1509 |
| DAMEION L. DUNN, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1     *Held*: The record demonstrated no error in determining that defendant knowingly, intelligently, and voluntarily waived his right to counsel. Defendant forfeited his argument that the trial court abused its discretion in admitting the victim's statements in her verified petition for an order of protection as substantive evidence or for impeachment purposes. The State presented sufficient evidence upon which the jury reasonably could conclude that defendant was guilty of aggravated domestic battery. Affirmed.

¶ 2     Following a jury trial, defendant, Dameion L. Dunn, was convicted of aggravated domestic battery. Defendant appeals his conviction on grounds that his waiver of the right to counsel was not valid, the trial court abused its discretion in admitting the victim's statements in her verified

petition for an order of protection as substantive evidence or for impeachment purposes, and the State failed to prove his guilt beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4     Defendant was indicted for charges arising out of a July 25, 2018, incident involving Kendria Armstrong—the mother of three of defendant's children. The seven-count indictment alleged three counts of aggravated domestic battery and four counts of domestic battery, respectively, as follows: (1) aggravated domestic battery—knowingly caused great bodily harm in that defendant struck Armstrong on or about the body causing a nasal bone fracture (720 ILCS 5/12-3.3(a) (West 2018)); (2) aggravated domestic battery—knowingly caused bodily harm in that defendant strangled Armstrong by intentionally impeding her normal breathing by applying pressure on her throat or neck (720 ILCS 5/12-3.3(a-5) (West 2018)); (3) aggravated domestic battery—knowingly made physical contact of an insulting or provoking nature in that defendant strangled Armstrong by intentionally impeding her normal breathing by applying pressure on her throat or neck (720 ILCS 5/12-3.3(a-5) (West 2018)); (4) domestic battery—knowingly caused bodily harm in that defendant struck and/or held Armstrong on or about the neck and/or body, having been previously convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)); (5) domestic battery—knowingly made contact of an insulting or provoking nature in that defendant struck and/or held Armstrong on or about the neck and/or body, having been previously convicted of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)); (6) domestic battery—knowingly caused bodily harm in that defendant struck, and/or punched, and/or kicked Armstrong on or about the body, having been previously convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)); and (7) domestic battery—knowingly made contact of an insulting or provoking nature in

that defendant struck, and/or punched, and/or kicked Armstrong on or about the body, having been previously convicted of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)).

¶ 5                                A. Pretrial Proceedings

¶ 6     Defendant was arrested and appeared by video for a bond hearing on October 26, 2018. The order entered on that date stated that "[n]o attorney is available and the Defendant, after having been advised of the right to an attorney, waives this right for this hearing only." Bond was set at $30,000, and defendant was remanded to the custody of the Kane County Sheriff. The record reflects that the Kane County Public Defender subsequently was appointed to represent defendant. On October 30, 2018, an assistant public defender filed a speedy trial demand on defendant's behalf. At a November 1, 2018, status hearing, an assistant public defender appeared on defendant's behalf, noted defendant's presence in court, and requested a one-week continuance for arraignment.

¶ 7                                1. Waiver of Right to Counsel

¶ 8     At the November 8, 2018, arraignment, an assistant public defender appeared on defendant's behalf and advised the trial court that, although the case was originally assigned to the Kane County Public Defender's Office, "[t]his morning we were informed that it would be going to the Multiple Defendant's Division." The assistant public defender further advised: "We are also not sure that the Multiple Defendant's Division may be able to keep this case. I did explain that to [defendant], but I believe he wishes to address the Court." The following colloquy ensued:

> "THE COURT: Mr. Dunn.
>
> DEFENDANT: Can I please set this case for speedy trial?
>
> * * *

THE COURT: You're making a speedy trial demand? I don't know even if you have a lawyer to represent you at this point. Do you think that's a smart thing for you to do?

DEFENDANT: I'll represent myself.

THE COURT: You think that's a smart thing for you to do?

DEFENDANT: I think it is.

THE COURT: All right. Mr. Dunn, I have to ask some questions then. How far, first of all, did you go in school?

DEFENDANT: 12.

THE COURT: You can read and write?

DEFENDANT: Yes, sir.

THE COURT: Have you been to court on other cases?

DEFENDANT: Yes, sir.

THE COURT: Do you understand that if you represent yourself, you're treated the same way as a lawyer would be treated, do you understand that?

DEFENDANT: Yes, sir.

THE COURT: You're expected to know the Rules of Evidence?

DEFENDANT: Yes, sir.

THE COURT: Criminal procedure?

DEFENDANT: Yes, sir.

THE COURT: And you understand all that?

DEFENDANT: Yes, sir.

THE COURT: And you wish to represent yourself?

DEFENDANT: Yes, sir.

THE COURT: All right. If you're going to represent yourself, I'm going to arraign you today and tell you what these charges are against you and what the possible penalties are."

¶ 9 The trial court proceeded to explain the nature of the charges and the minimum and maximum sentences. Defendant stated that he understood the charges against him and the possible penalties. The trial court inquired, "And knowing that, you still wish to represent yourself." Defendant responded, "Yes, sir." The trial court proceeded to admonish defendant as to the presumption of innocence, the State's burden of proof, the right to "a jury of 12 people or before a judge sitting alone, which is called a bench trial," the right to confront and cross-examine witnesses, the right to present evidence in his own defense, the right to remain silent, the right to use the subpoena power of the court, and "the right to be represented by an attorney." Defendant stated that he understood those rights. At that point, the assistant public defender entered a plea of not guilty to each count on defendant's behalf.

¶ 10 The trial court then stated: "All right. And based on [defendant's] desires, I'm going to discharge the Public Defender's Office. Mr. Dunn, you can represent yourself, and we'll set the case for trial today." The assistant state's attorney interjected to make clear for the record that, with respect to the aggravated domestic battery counts, the sentence term would be at 85%. The colloquy continued:

"THE COURT: All right. Do you understand that, sir?

DEFENDANT: Yes, sir. Will this be a bench trial or a jury trial, sir?

THE COURT: You demanded a jury trial, so I'll set it for jury trial.

DEFENDANT: Oh, okay."

¶ 11    Subsequently, at a December 7, 2018, status hearing, the trial court inquired as to whether defendant was represented by the Public Defender's Office. Defendant responded, "No, I'm *pro se*." The trial court further inquired, "And you wish to represent yourself?" Defendant responded, "Yes, sir." Defendant represented himself throughout the trial proceedings.

¶ 12                                  2. Motion *in Limine*

¶ 13    The State filed a motion *in limine* to admit evidence of other acts of domestic violence pursuant to sections 115-7.4 and 115-20 of the Code of Criminal Procedure of 2012 (Code) (725 ILCS 5/115-7.4, 115-20 (West 2018)). The State sought to introduce evidence regarding a May 6, 2015, domestic violence incident involving Armstrong. The State also sought to introduce evidence of a May 28, 2011, domestic violence incident involving defendant's sister and a March 3, 2010, domestic violence incident involving defendant's former girlfriend. At the December 21, 2018, hearing on the motion, the trial court initially inquired of defendant, "And you're representing yourself; is that right?" Defendant responded, "Yes, sir." Following argument, the trial court granted the State's motion in part, over defendant's objection. The trial court held that the State could admit evidence regarding the May 6, 2015, domestic battery incident involving Armstrong, but not evidence regarding the other two incidents.

¶ 14                                  B. Trial Proceedings

¶ 15    A jury trial commenced on February 19, 2019. The State called six witnesses: Armstrong; Elgin police officer Shawn Sproles; Carpentersville police officers David Rowley, Joseph Pilarski, and Dhaval Patel; and Dr. Nilesh Patel.

¶ 16    Armstrong testified that she had known defendant for five years and that he was the father of three of her children. On July 25, 2018, Armstrong lived in a house at 66 Ash Street in Carpentersville. Armstrong testified that she did not see, converse, or have any contact with

defendant that day. At this point, the State showed Armstrong People's Exhibit No. 1—a verified petition for an order of protection. Armstrong confirmed that she signed the petition and that it was dated July 26, 2018—the day after the offense. The State moved to admit the exhibit into evidence. The trial court inquired, "Is there any objection?" Defendant responded, "No, sir."

¶ 17 The petition alleged:

"Wednesday 7/25/18—The Respondent needed to use the Petitioner's car to get to work and he became irate that she was not driving quickly enough to get to him. When the Petitioner arrived, the parties began arguing and he became upset that the Petitioner should [*sic*] not 'shut up' and he slapped her. The Respondent then attacked the Petitioner by beating her with a stick, punching her in the face, choking and kicking her. The Petitioner ran to get her phone and the Respondent took it and threw it across the phone [*sic*] and began leaving the residence. The Petitioner followed him out the door and began yelling for help and for someone to call the police. A pedestrian driving heard the Petitioner and stopped to call the police. The Petitioner was trying to keep her eyes on the Respondent so when the police arrived they could arrest him. By the time Carpentersville police showed up the Respondent was gone. The Petitioner made a police report and the officers stated they would seek charges for 'aggravated battery and bodily harm' as well as 'strangulation.'

The Petitioner was taken to the hospital for her injuries, she has a broken nose, swelling, bruising, and head injuries."

¶ 18 Armstrong confirmed that, on the petition, her name was above "plaintiff/petitioner," and defendant's name was above "defendant/respondent." The State recited allegations from the

petition and questioned Armstrong as to whether the statements were correct. Armstrong responded that the content had been accurately recited.

¶ 19    Armstrong further testified that she went to Sherman Hospital on July 25, 2018. When she left, she spoke to a police officer outside the hospital. However, she did not remember what she said to the officer. Armstrong recalled that the officer asked her name "and then he talked to my mother for a while, and then he took pictures, and then he allowed me and my mother to leave." Armstrong testified that, when she left the hospital, she remembered having a headache. She believed that she "was asleep again when [she] was in the car with [her] mother" and "ended up back at [her] sister's house" where her children were and where she then went to sleep. Armstrong further testified that she did not remember seeking an order of protection against defendant.

¶ 20    The State then proceeded to question Armstrong about the May 6, 2015, domestic violence incident. Prior to questioning, the trial court instructed the jury in accordance with Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) ("Proof of Other Offenses or Conduct") (hereinafter IPI Criminal No. 3.14), as follows:

> "Evidence has been received that the defendant has been involved in an offense and/or conduct other than that charged in the indictment. This evidence has been received on the issue of the defendant's propensity to commit an act of domestic battery. It is for you to determine whether the defendant was involved in that offense and/or conduct, and, if so, what weight should be given to this evidence on the issue of the defendant's propensity to commit an act of domestic battery."

¶ 21    Armstrong testified that, at the time of the May 6, 2015, prior domestic violence incident, defendant was her boyfriend and they had one child together. They had an argument that day and yelled at each other, although Armstrong did not "really remember about what." The argument led

"into a fight to where I was hit, and I was cutting him." Armstrong testified that defendant hit her with his hands and kicked her "[e]verywhere" on her body. Armstrong explained that a neighbor contacted the police and that the police photographed her injuries at the scene.

¶ 22    Officer Sproles also testified regarding the May 6, 2015, previous domestic violence incident. At approximately 11:40 a.m. on May 6, 2015, he was dispatched to an apartment building on Villa Street in Elgin. When he arrived, he had contact with Armstrong, three children, and a woman named "Ignacio" who lived in the apartment building. Officer Sproles described Armstrong's appearance and demeanor. She had injuries to her face, including "a busted lip and a knot on her forehead," and there were blood stains on her shirt. Armstrong was "distraught" and "had a hard time relaying things to me in a coherent fashion." He did not notice any "odor of alcohol" from Armstrong.

¶ 23    Based upon his observations, Officer Sproles "asked for a paramedic to come and check on her wellbeing" and photographed Armstrong. He identified People's Exhibit Nos. 15 and 16 as two photographs he took of Armstrong on May 6, 2015, showing "injuries that she said [were] caused by the defendant." He described their content: (1) a photograph of the knot on Armstrong's forehead (although difficult to see) and a "busted" bottom lip; and (2) a photograph showing Armstrong's "busted lip." Over defendant's objection, the photographs were admitted into evidence and published to the jury.

¶ 24    Following Officer Sproles's investigation, charges were filed against defendant. Officer Sproles identified People's Exhibit No. 18 as a packet containing "a certified copy of a complaint," a "charge," and a "conviction" relating to the May 6, 2015, incident. The exhibit was admitted into evidence without objection. The packet included certified copies of a two-count complaint against defendant for domestic battery, defendant's plea of guilty to one count, and the sentencing order.

¶ 25    Officers Rowley, Pilarski, and Patel testified regarding their investigation of the July 25, 2018, incident at issue in this case. Officer Rowley testified that, on the evening of July 25, 2018, he received a dispatch call to the area of Tulsa and Sacramento roads in Carpentersville. He was not provided any information regarding the identity of the 911 caller. Officer Rowley was the first police officer to arrive at the scene. Upon arrival, he found "a female who was sitting on the sidewalk yelling and screaming." The woman later was identified as Armstrong. Officer Rowley immediately called for an ambulance because he observed blood on Armstrong's shirt and "it seemed like there were medical issues going on." However, he did not immediately see any physical injuries. Officer Rowley described Armstrong's demeanor as "hysterical." She "seemed to be kind of out of it" and "might have been intoxicated." He did not observe any suspicious persons in the area, and a canvass of the vicinity yielded no information. Officers Pilarski and Patel arrived and assumed the investigation.

¶ 26    Officer Patel was in training with the Carpentersville Police Department on July 25, 2018. His field training officer was Officer Pilarski. Officer Pilarski testified that, at 8:51 p.m., he and Officer Patel were dispatched to the area of Tulsa and Sacramento roads for a possible domestic battery. Officer Pilarski testified that Armstrong was sitting on the curb, screaming, crying, and asking for help. She had blood on her face and shirt, and she did not have her cell phone with her. Officer Pilarski described Armstrong's demeanor: "She was acting very disoriented. She had a hard time keeping balance herself. Her words appeared to be slurred and just very difficult to understand and get any straight answers out of her at the time." He did not detect the "odor of alcohol." Armstrong "eventually [] was able to tell us what took place."

¶ 27    Officer Pilarski further testified that, when he approached Armstrong, she stated that she did not know how she had arrived there. The intersection of Tulsa and Sacramento roads is a

residential area approximately a half mile from Armstrong's 66 Ash Street residence. The officers' search of the area did not yield information about the incident. Officer Pilarski elaborated: "While we were in [*sic*] route to the call, we had very limited information we were going on. It was a third party caller who remained anonymous, at which point when we arrived on scene, Miss Armstrong did give us a description of the person who assaulted her. And when we were in route to the call, we did not observe anyone at that point." In addition, Officer Pilarski testified, Armstrong said that "her friend was at the residence where this took place and that she wasn't able to provide any information who that friend was."

¶ 28    Officer Patel likewise testified that, when they arrived at the dispatch scene, Armstrong was sitting on the curb and was "pretty disoriented." She was "screaming for help" and "saying the guy hit me and ran away in that direction." Armstrong also was "crying hysterically" and repeating herself. Her speech was slurred; she had "mucous all around her face"; and she had "blood on her white tank top." Armstrong said that "she got hit by her baby's father named Dameion Dunn, and she said he hit me with a stick and kept repeating the same word, he hit me with a stick." She also described the person who hit her.

¶ 29    At this point, the State introduced Officer Patel's report to refresh his recollection. He testified regarding further information that Armstrong provided. Namely, Armstrong recounted that she had picked up her kids from daycare and when she arrived at her house at 66 Ash Street, defendant was "mad at her and started yelling at her and punched her a couple of times in the face." Officer Patel testified that, after Armstrong was transported to the hospital, he and Officer Pilarski went to 66 Ash Street to check on the children. The front door to the house was half open, and a minivan with an open passenger's door was in the driveway. They checked the interior of the home, but no one was inside. They "located a purple phone and the keys for the car inside the

house and checked around the area and talked to the neighbor, but we couldn't get any information" and did not observe any suspicious persons.

¶ 30    Officer Patel's report reflected that no weapon was used, and the report did not include Armstrong's statement that she was struck by a stick. He testified that this was a mistake. Officer Patel acknowledged that he did not observe any visible injuries when he first approached Armstrong. He also acknowledged that it took several attempts to identify Armstrong because she was uncooperative and worried about her children. She was unsure how she had gotten that far away from her house and could not find her cell phone. She also said that a friend was with her when the incident occurred but could not provide any further information in that regard. Officer Patel testified that there was no friend present during their investigation.

¶ 31    After canvassing the area, Officers Pilarski and Patel went to Sherman Hospital. When they arrived, they saw Armstrong in the parking lot leaving the emergency room. Officer Patel testified that "[a]pproximately a couple of hours" had passed since they first encountered Armstrong. At this point, her demeanor was "normal," and she was "talking normal." The officers had a second conversation with Armstrong, and she advised that defendant "strangled her, choked her" and that she "was almost unable to breath[e]." Officer Patel "told her to come for the written statement, and we took a picture of her injuries, and get [*sic*] her medical records from the hospital." The officers attempted to make contact with defendant but were unable to do so. Both officers testified that Armstrong promised that she would come in the next day to provide a written statement but did not do so.

¶ 32    Officer Pilarski testified that, at the hospital, he observed a large lump on the back of Armstrong's head behind her left ear and also learned that she had a broken nose. He identified People's Exhibit Nos. 5 through 10 as six photographs he took of Armstrong at Sherman Hospital

on July 25, 2018. He described their content: (1) "an overall photo" of Armstrong showing "blood on her white shirt"; (2) "a closer overall photo once again depicting the blood on her shirt" and "a mark on her forehead" above her nose; (3) a photograph showing a mark above the bridge of Armstrong's nose; (4) a close-up photograph of the injuries to Armstrong's forehead and nose; (5) a photograph showing, although "kind of hard to see" in the photograph, "a large lump right behind the left side of [Armstrong's] ear, which is very—it coincides with what the victim stated is that she was struck in the back of the head with a piece of a crib"; and (6) a photograph from another angle of the injury on the back of Armstrong's head behind her left ear. Over defendant's objections, the photographs were admitted into evidence and published to the jury.

¶ 33    Dr. Patel, an emergency room physician at Sherman Hospital, testified that he treated Armstrong on July 25, 2018. After reviewing Armstrong's medical records, Dr. Patel testified that his assessment and examination of Armstrong showed mainly facial injuries. A CT scan also showed a broken nose. He did not recall his encounter with Armstrong but testified that the records reflected that she was belligerent and uncooperative. Dr. Patel acknowledged that belligerence is "sometimes consistent with being intoxicated" and did not recall whether Armstrong's blood work was taken.

¶ 34    Prior to the close of the State's case, and outside the presence of the jury, the trial court admonished defendant regarding the right to testify. After a recess, defendant advised that he did not intend to testify. Following the close of the State's case, the trial court *sua sponte* considered a motion for a directed verdict. In denying the motion, the trial court found, "based on the written statement that is part of the order of protection that there is sufficient evidence at this point to move forward." The trial court again inquired of defendant whether he intended to testify; defendant responded in the negative.

¶ 35    At this juncture, the State suggested a redacted version of Armstrong's July 26, 2018, verified petition for an order of protection for submission to the jury to reflect only the portion of the narrative section that was "used to impeach—or as substantive evidence with Ms. Armstrong." The trial court agreed, and a redacted version of the petition, reflecting only the relevant allegations in the narrative section, Armstrong's signature, and the signed certification pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2018)), was provided. The following colloquy ensued:

"DEFENDANT: Your Honor, is the order of protection still going on?

THE COURT: What do you mean still going on?

DEFENDANT: It's still active?

THE COURT: I don't know."

¶ 36    The trial court proceeded to inquire of defendant whether he wished to introduce any evidence. Defendant responded, "No. I rest." The parties presented closing arguments.

¶ 37    Following deliberations, the jury returned a verdict of guilty on one count of aggravated domestic battery (count 1) and three counts of domestic battery (Counts 5, 6, and 7). The jury returned a verdict of not guilty on the remaining three counts.

¶ 38                                C. Posttrial Proceedings

¶ 39    Pursuant to defendant's request, the trial court appointed the Kane County Public Defender's Office to represent him at sentencing. Prior to sentencing, appointed counsel filed a motion (and then an amended motion) for a judgment notwithstanding the verdict or for a new trial. Defendant argued that the State failed to prove his guilt beyond a reasonable doubt. He also argued that the trial court erred in allowing the State to present evidence of prior bad acts and in denying defendant's objections to tendered jury instructions. And finally, he argued that the trial

court erred in allowing the State to improperly impeach Armstrong. Specifically, he cited Armstrong's response of "I don't remember" to certain questions asked by the State on direct examination. According to defendant, based upon these responses, the State was allowed to introduce Officer Patel's testimony regarding hearsay statements made by Armstrong. However, defendant argued, Armstrong's inability to remember did not affirmatively damage the State's case—a prerequisite for the State's impeachment of its own witness with a prior inconsistent statement.

¶ 40    At the hearing on the amended motion for a judgment notwithstanding the verdict or for a new trial, the trial court inquired: "The statements that you're referring to as impeachment were actually the order of protection petition *** that she acknowledged that she signed and also her written statement, is that correct?" The assistant public defender responded, "Yes." The trial court replied: "Those were both actually substantive evidence, not impeachment." The assistant public defender maintained that "the way this information came in through the trial was solely through impeachment." The assistant state's attorney responded that the statements were properly used for impeachment because Armstrong's testimony affirmatively damaged the State's case. Regardless, the State argued, "the jury still would have found the defendant guilty because the statements that were admitted were in the order of protection."

¶ 41    Following argument, the trial court denied defendant's amended motion for a judgment notwithstanding the verdict or for a new trial. Regarding defendant's argument that the State was improperly allowed to impeach Armstrong, the trial court found the argument "waived" given defendant's lack of objection. On the merits, the trial court found that Armstrong's testimony was affirmatively damaging to the State's case given her lack of memory regarding "anything" and "denial that she was even with the defendant." Thus, the impeachment was "completely proper."

Moreover, "the statements she had made in the order of protection were admitted to show that in fact at one point she said she did know where they [her injuries] came from and how she was injured and that she was with Mr. Dunn." Regarding defendant's remaining arguments, the trial court found that "the jury verdict was appropriate given the testimony that was heard" and that there was no error in the jury instructions or in allowing evidence of prior bad acts.

¶ 42    After a sentencing hearing, the trial court sentenced defendant to four years' imprisonment for aggravated domestic battery (the four counts of which defendant was found guilty were merged for sentencing), to be served at 85%, and a four-year period of mandatory supervised release. Defendant moved to reconsider his sentence. The trial court denied the motion.

¶ 43    Defendant timely appealed. Counsel was appointed to represent defendant on appeal.

¶ 44                                II. ANALYSIS

¶ 45    Defendant argues that he did not knowingly, intelligently, or voluntarily waive his right to counsel. He also argues that the trial court abused its discretion in allowing the State to introduce the statements in Armstrong's verified petition for an order of protection as substantive evidence or for impeachment purposes. And finally, defendant challenges the sufficiency of the evidence to support his conviction for aggravated domestic battery. We address each argument in turn.

¶ 46                          A. Waiver of Right to Counsel

¶ 47    "The sixth amendment to the United States Constitution (U.S. Const., amend VI) guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel." *People v. Wright*, 2017 IL 119561, ¶ 39 (citing *Faretta v. California*, 422 U.S. 806, 832-34 (1975)). Although the court may consider the decision unwise, a defendant's knowing, intelligent, and voluntary election to represent oneself "must be

honored out of that respect for the individual which is the lifeblood of the law." (Internal quotation marks and citations omitted.) *Id.*

¶ 48    Defendant's argument centers on his claim that the trial court failed to comply with Supreme Court Rule 401(a) (eff. July 1, 1984) in admonishing him prior to his waiver of counsel. The State argues that defendant forfeited consideration of this issue by failing to object at trial or include the issue in his posttrial motion. See *People v. Cregan*, 2014 IL 113600, ¶ 15 ("To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion."). However, defendant invokes the plain-error doctrine, which allows us to consider an unpreserved error that is clear or obvious when (1) the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. See *People v. Belknap*, 2014 IL 117094, ¶ 48. Defendant argues that his claim of failure to comply with Rule 401(a) is reviewable under second-prong plain error. See *People v. Black*, 2011 IL App (5th) 080089, ¶ 24. There can be no plain error, however, unless we first determine that error occurred. See *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 49    Rule 401(a) provides:

   "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

   (1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 50     Nevertheless, our supreme court has "recognized for 30 years that '[s]trict technical compliance with Rule 401(a) [] is not always required' for an effective waiver of counsel." *Wright*, 2017 IL 119561, ¶ 41 (quoting *People v. Haynes*, 174 Ill. 2d 204, 236 (1996)). Rather, "[s]ubstantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Id.* (quoting *Haynes*, 174 Ill. 2d at 236 (citing *People v. Coleman*, 129 Ill. 2d 321, 333 (1989), and *People v. Johnson*, 119 Ill. 2d 119, 132 (1987))). Substantial compliance may be found where the "deficiency in the admonishments does not prejudice the defendant, either because the defendant already knows of the omitted information or because the defendant's degree of legal sophistication makes evident his or her awareness of the omitted information." *People v. Moore*, 2014 IL App (1st) 112592-B, ¶ 38. The determination of whether there was a valid waiver of the right to counsel depends upon "the particular facts and circumstances of [the] case, including the background, experience, and conduct of the accused." *People v. Kidd*, 178 Ill. 2d 92, 105 (1997). We review the trial court's compliance with Rule 401(a) *de novo* and its decision to accept defendant's waiver of counsel for an abuse of discretion. See *People v. Washington*, 2016 IL App (1st) 131198, ¶ 50. A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the court's view. *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20.

¶ 51    Here, defendant does not dispute that he was admonished as to the nature of the charges against him and the minimum and maximum potential sentences—the first two admonishments prescribed by Rule 401(a). See Ill. S. Ct. R. 401(a)(1) and (a)(2) (eff. July 1, 1984). Rather, defendant argues that he was prejudiced because he "was not advised that if he were indigent and desired to be represented by an attorney one would be appointed for him"—the third admonishment prescribed by Rule 401(a)(3). The State concedes that the trial court failed to inform defendant of his right to counsel in accordance with Rule 401(a)(3) during its admonishment but argues that the entirety of the record reflects that defendant knew of his right to counsel and his right to appointed counsel if indigent. Accordingly, the State argues, the facts and circumstances surrounding defendant's waiver of counsel established substantial compliance with Rule 401(a) and that defendant knowingly, intelligently, and voluntarily waived his right to counsel. We agree, as set forth below.

¶ 52    The record demonstrates that defendant was represented by the Public Defender's Office prior to his waiver of the right to counsel. On October 30, 2018, an assistant public defender filed a speedy trial demand on defendant's behalf. At both the November 1, 2018, and November 8, 2018, hearings, at which defendant was present, an assistant public defender appeared on defendant's behalf. At the November 8, 2018, hearing, the assistant public defender reported that the case originally was assigned to the Kane County Public Defender; that the case was being transferred to the "Multiple Defendant's Division" but that it was uncertain whether that division would retain the case; and that she "explain[ed] that to Mr. Dunn, but I believe he wishes to address the Court." At that point, defendant stated that he would represent himself. Following the trial court's admonishments and defendant's confirmation that he understood his rights and sought self-representation, the assistant public defender entered a plea of not guilty on defendant's behalf. At

this point, the trial court stated that "based on Mr. Dunn's desires, I'm going to discharge the Public Defender's Office" and informed defendant: "[Y]ou can represent yourself, and we'll set the case for trial today."

¶ 53 Accordingly, given defendant's initial representation by the Kane County Public Defender and the trial court's explicit discussion of this representation with defendant, defendant's knowledge of his right to counsel and his right to appointed counsel if indigent is readily apparent from the record. See *People v. Phillips*, 392 Ill. App. 3d 243, 264 (2009) ("[S]ince defendant had, until that moment, been represented by appointed counsel, he knew that he had a right both to counsel in general and to appointed counsel due to being indigent."); *People v. Jackson*, 59 Ill. App. 3d 1004, 1008 (1978) ("We conclude defendant understood this right to counsel because he had in fact been represented by the public defender of Cook County without charge, until he discharged him ***.").

¶ 54 Moreover, the record demonstrates that defendant had extensive prior experience with the court system. Defendant responded affirmatively when the trial court questioned him at the November 8, 2018, hearing as to whether he had been to court on other cases. At the time, defendant was 31 years old with a criminal history that included convictions for domestic battery, resisting arrest, delivery of a controlled substance, driving under the influence, criminal trespass to a vehicle, retail theft, and driving with a suspended license. Defendant's familiarity with criminal proceedings supported a determination that defendant knew of his right to counsel and his right to appointed counsel if indigent. See *Johnson*, 119 Ill. 2d at 133 (substantial compliance with Rule 401(a) was demonstrated, in part, because "the record reveals that defendant is no stranger to criminal proceedings"); *Jackson*, 59 Ill. App. 3d at 1008-09 (substantial compliance

with Rule 401(a) was demonstrated, in part, due to "defendant's lengthy record and his familiarity with criminal law and procedure").

¶ 55    Defendant nevertheless contends that the record reflects his "confusion." Specifically, defendant cites his question at the November 8, 2018, hearing as to whether he would receive a jury trial or a bench trial and the trial court's response that defendant had requested a jury trial. Defendant points out that he had merely requested a speedy trial at this point, not a jury trial. However, the record reflects that defendant had been admonished of, *inter alia*, the right to "a jury of 12 people or before a judge sitting alone, which is called a bench trial" and affirmatively stated that he understood the right. Even if defendant had desired a bench trial rather than a jury trial—a claim he does not make on appeal—he was aware of the option and had ample opportunity to advise the trial court accordingly.

¶ 56    Defendant maintains that he "was prejudiced by the trial court's errors and abuse of discretion." However, he fails to identify any prejudice. Following the admonishments at the November 8, 2018, hearing, defendant waived his right to counsel. He responded affirmatively when questioned whether he understood the standards to which he would be held and confirmed that he wished to represent himself. Following admonishments as to the nature of the charges against him and the minimum and maximum potential sentences, defendant again confirmed that he wished to represent himself. A month later, at the December 7, 2018, status hearing, defendant expressly reiterated his desire to represent himself. Defendant never requested the reappointment of appointed counsel nor sought a continuance to hire counsel. Accordingly, the facts and circumstances of this case demonstrate substantial compliance with Rule 401(a) and no error in accepting defendant's waiver of his right to counsel. Defendant, therefore, cannot establish plain error.

¶ 57                    B. Statements in Verified Petition for Order of Protection

¶ 58    Section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2018)) allows for the use of a witness's prior inconsistent statement as substantive evidence when, in relevant part, the statement is inconsistent with the witness's trial testimony, the witness is subject to cross-examination regarding the statement, the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge," and the statement "is proved to have been written or signed by the witness." 725 ILCS 5/115-10.1(a), (b), and (c)(2)(A) (West 2018). "Laying the foundation for the admission of a prior inconsistent statement as substantive evidence under section 115-10.1 of the Code is essentially the same as laying the foundation to impeach a witness with [her] prior inconsistent statement." *People v. Edwards*, 309 Ill. App. 3d 447, 457 (1999) (Steigmann, J., specially concurring). Such foundation includes asking the witness whether she made the inconsistent statement and directing the witness to " 'the time, place, and circumstances of the statement and its substance.' " *Id.* at 457-58 (Steigmann, J., specially concurring) (quoting *People v. Hallbeck*, 227 Ill. App. 3d 59, 62 (1992)).

¶ 59    Where a prior inconsistent statement is not admissible as substantive evidence, "that statement can only be used for impeachment when the testimony of that witness does 'affirmative damage' to the party's case." *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 62 (quoting *People v. Cruz*, 162 Ill. 2d 314, 361 (1994)). A witness's testimony must give " 'positive aid' " to the defendant's case to be "affirmatively damaging, as opposed to merely disappointing to the prosecution's case." *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 47 (quoting *Cruz*, 162 Ill. 2d at 360).

¶ 60    Defendant contends that the trial court abused its discretion in allowing the State to use Armstrong's verified petition for an order of protection either as substantive evidence or to

impeach Armstrong's credibility. Defendant does not argue that the State failed to meet the foundational requirements for use of the petition. Rather, he argues that the statements in the petition were merely allegations and points out that the petition was in fact dismissed following Armstrong's failure to appear. According to defendant, the trial court erroneously "failed to take notice, judicially or otherwise, of Armstrong's pleading to clarify the basis for admissibility," and consequently, "neither the trial court nor the jury knew that the petition for order of protection had been dismissed." Defendant also contends that use of the statements in the petition for impeachment purposes was improper because Armstrong's trial testimony "may have disappointed" the State but did not damage the State's case.

¶ 61    On the merits, the State responds that the trial court properly admitted Armstrong's statements as substantive evidence and for impeachment purposes. The State points out that it laid a proper foundation for admission of the statements and argues that Armstrong's assertion at trial regarding lack of any contact or conversation with defendant on the day of the offense "potentially undermined [its] entire case."

¶ 62    Initially, however, the State argues that defendant forfeited any challenge to use of the petition by failing to raise the objection at trial. See *Cregan*, 2014 IL 113600, ¶ 15. We note that defendant also failed to raise this issue in his posttrial motion, instead arguing that the State improperly impeached Armstrong with Officer Patel's testimony regarding Armstrong's statements to him at the scene. Defendant appears to acknowledge the forfeiture in arguing, without elaboration or analysis, that "the error was plain." In addition to the deficient development of the analysis, the "[p]lain-error analysis, of course, 'applies to cases involving procedural default *** , not affirmative acquiescence.' " *People v. Dunlop*, 2013 IL App (4th) 110892, ¶ 12. Here, defendant affirmatively acquiesced to admission of the verified petition for an order of protection.

The trial court specifically asked defendant whether he had any objection to admission of the petition. Defendant responded, "No, sir." While the record reflects uncertainty as to whether "the order of protection [was] still going on," the status of the order-of-protection proceeding was not determinative of whether the State met the foundational requirements for admission of the petition or whether Armstrong's testimony affirmative damaged the State's case. The point is that, when asked for any objection to admission of the petition, defendant affirmatively responded that he had none. Accordingly, we decline to consider defendant's argument under the plain-error doctrine. See *id.*

¶ 63    As a final matter, defendant summarily adds to his argument regarding admission of the petition that the trial court "erred in allowing the introduction of Armstrong's hearsay statements through Officers Patel's and Pilarski's trial testimony." However, defendant does not develop the argument or provide supporting authority. "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive legal arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). It is neither the obligation nor the function of a reviewing court to act as an advocate or search the record for error. *Id.* The consequences of failure to comply with these requirements is forfeiture of the arguments on appeal. *Id.* Accordingly, defendant's challenge to introduction of the statements through the police officers' testimony is forfeited.

¶ 64                          C. Sufficiency of the Evidence

¶ 65    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court faced with a challenge to the sufficiency of the evidence must determine "whether, [after] viewing the evidence in the light most favorable

to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The reviewing court's role is not to retry the defendant. *Id.* Rather, it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed unless the evidence is "so unreasonable, improbable, or unsatisfactory" that it leaves reasonable doubt of the defendant's guilt. *Id.*

¶ 66    Here, considering the evidence in the light most favorable to the prosecution, the record demonstrates that a rational trier of fact could have found the essential elements of aggravated domestic battery beyond a reasonable doubt. See 720 ILCS 5/12-3.3(a) (West 2018) ("A person who, in committing a domestic battery, knowingly causes great bodily harm *** commits aggravated domestic battery"). Although at trial Armstrong denied any contact or conversation with defendant on the day of the offense, the verified petition for an order of protection reflected Armstrong's allegations from the day after the offense. Armstrong alleged in the petition that, on July 25, 2018, defendant attacked Armstrong "by beating her with a stick, punching her in the face, choking and kicking her." She further alleged that she was taken to the hospital and sustained a broken nose, swelling, bruising, and head injuries.

¶ 67    Testimony from the investigating officers and treating physician corroborated Armstrong's allegations. The officers were dispatched to a possible domestic battery. When they arrived at the scene, Armstrong was sitting outside on a curb screaming for help. She had blood on her face and her shirt. Detective Rowley immediately called an ambulance. Armstrong told the officers that defendant hit her with a "stick." Dr. Patel treated Armstrong in the emergency room. He testified

that Armstrong exhibited facial injuries and that a CT scan revealed a broken nose. Officer Pilarski also testified that, when he returned to the hospital later that evening, he observed a large lump on the back of Armstrong's head. Photographs of her injuries were admitted into evidence. In addition, the State introduced evidence of the May 6, 2015, prior domestic violence incident in which Armstrong sustained a "knot on her forehead" and a "busted lip." Considering all of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of aggravated domestic battery beyond a reasonable doubt.

¶ 68 Defendant, however, argues that the record demonstrated failure to investigate missing witnesses who "would not only have been exculpatory, but cast doubt upon the reliability of the People's case ***." The State responds that defendant forfeited this issue by failing to raise the issue at trial or in his posttrial motion. We agree that defendant failed to raise the issue below, although we point out that challenges to the sufficiency of the evidence are not subject to forfeiture. See *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Space*, 2018 IL App (1st) 150922, ¶ 37. Nevertheless, while labeled as such, defendant's argument is not necessarily grounded in a challenge to the sufficiency of the evidence. Rather, defendant argues that he was denied a fair trial because the police failed to investigate material witnesses. Namely, the record demonstrated that Armstrong told police that her friend was at the residence where the offense occurred. In addition, according to defendant, testimony regarding the May 6, 2015, prior incident likewise reflected the presence of a friend at the residence where the offense occurred. Defendant argues that the State made no effort to locate these witnesses, in violation of the investigating officers' duty to interview all witnesses and pursue all leads (see 50 ILCS 705/7(a) (West 2018)), and the state's attorney's duty to investigate the facts (see *People v. Ringland*, 2017 IL 119484, ¶ 22) and

"see that 'justice is done not only to the public at large but to the accused as well' " (see *People v. Williams*, 147 Ill. 2d 173, 256 (1991) (quoting *People v. Pohl*, 47 Ill. App. 2d 232, 241-43 (1964)).

¶ 69    Regardless of its label and posture, the argument lacks merit. Extensive testimony regarding the police officers' investigation was introduced at trial. Officer Pilarski testified that the police "had very limited information" while en route to Armstrong's locale because they were responding to "a third party caller who remained anonymous." Upon arrival, the only person present was Armstrong. Officer Patel testified that Armstrong relayed that "she got hit by her baby's father named Dameion Dunn" and provided a physical description of defendant. Both Officers Pilarski and Patel testified regarding Armstrong's statement that a friend was at the residence when the offense occurred, but Armstrong was unable to provide information as to the friend's identity. The officers proceeded to canvass the area as part of the investigation. Their testimony established neither the presence of a friend nor, indeed, the presence of anyone at the residence. Their testimony further established that they attempted, but were unable, to locate any additional witnesses. Accordingly, there is simply no basis in the record to support defendant's contention that he was denied a fair trial because the police failed to investigate material witnesses.

¶ 70    Moreover, defendant's argument harkens back to the obsolete "reasonable-hypothesis-of-innocence" standard, *i.e.*, where the trier of fact was required to exclude every reasonable hypothesis of innocence before finding a defendant guilty in wholly circumstantial evidence cases. This is not a wholly circumstantial evidence case, but, more importantly, "the reasonable hypothesis of innocence standard of review is no longer viable in Illinois." *People v. Pintos*, 133 Ill. 2d 286, 291 (1989). Rather, the reasonable-doubt test as set forth in *People v. Collins*, 106 Ill. 2d 237, 261 (1985), applies in reviewing the sufficiency of the evidence in all criminal cases. *Pintos*, 133 Ill. 2d at 291. Under this standard, "the trier of fact is not required to accept any

possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). Here, as set forth above, after viewing the evidence in the light most favorable to the State, we cannot say that the evidence is so unreasonable, improbable, or unsatisfactory that it leaves reasonable doubt of the defendant's guilt.

¶ 71                                    III. CONCLUSION

¶ 72    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 73    Affirmed.